**AHMAD, ZAVITSANOS, & MENSING, PLLC**
Foster C. Johnson (SBN 289055)
fjohnson@azalaw.com
Joseph Ahmad (*pro hac vice forthcoming*)
joeahmad@azalaw.com
1221 McKinney Street, Suite 2500
Houston, TX 77010
Tel: (713) 655-1101
Fax: (713) 655-0062

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ~~JOHN DOE~~DAVID NOEL, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>PERPLEXITY AI, INC, META PLATFORMS, INC., AND GOOGLE, LLC<br><br><br><br><br>*Defendants*. | CASE NO. ~~————————~~3:26-cv-02803<br><br><br>~~CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL~~<br><br><br>**CORRECTED ORIGINAL CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff ~~John Doe~~David Noel ("Plaintiff"), individually and on behalf of all other similarly situated individuals, brings suit against Defendants Perplexity AI, Inc., Meta Platforms, Inc., and Google, LLC ("Defendants"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

CASE NO. ~~————————~~3:26-cv-02803    – 1 –

# I. SUMMARY OF ALLEGATIONS

1. Perplexity AI, Inc. ("Perplexity") owns and developed the Perplexity AI search engine (the "Perplexity AI Machine" or the "AI Machine"), one of the most popular AI search engines in the world.

2. The Perplexity AI Machine purports to provide advice and assistance to users on a wide range of sensitive issues, including health, finance, career choices, and personal wellness.

3. Perplexity touts that "[w]hen you ask Perplexity a question, it uses advanced AI to search the internet in real-time, gathering insights from top-tier sources" which the AI Machine then distills "into a clear, concise summary delivering exactly what you need in an easy-to-understand, conversation tone."[1]

4. Perplexity encourages users to engage with its AI Machine in an interactive dialogue, with users engaging the AI Machine in a real-time conversation, driven by questions and answers shared between users and Perplexity's AI Machine. As Perplexity explains, its AI Machine "leverages sophisticated AI to interpret your question, ensuring that it knows exactly what you are asking."[2]

5. For example, if a user asks Perplexity's AI Machine, "What is the best treatment for liver cancer?" Perplexity will scan health websites and medical journals, compile key facts into an overview, then present a series of follow-up prompts to elicit further questions from the user, encouraging users to engage in Perplexity describes as a "Conversational Dialogue." Perplexity describes its AI Machine as a kind of virtual expert on-demand: "Perplexity responds in a conversational manner. It's like chatting with an expert who truly understands your questions."[3]

---

[1] https://www.perplexity.ai/help-center/en/articles/10352895-how-does-perplexity-work

[2] *Id.*

[3] *Id.*

CASE NO. ~~_____~~ 3:26-cv-02803    − 2 −

6.      When conversing with Perplexity's AI Machine, users are encouraged to share intimate, personal details in response to follow-up questions from the AI Machine.  For example, in response to the question "What is the best treatment for liver cancer?", Perplexity's AI Machine volunteered that "I can help you interpret a specific scan report, biopsy result, or proposed treatment plan if you share more details."[4]

7.      With access to users' personal information, Perplexity claims that "You can ask follow-up questions, and Perplexity will remember the context of your previous queries, ensuring a seamless, flowing conversation."[5]

8.      Plaintiff and Class Members provided their personal information to Perplexity with the reasonable expectation that Perplexity would not share their conversations with tech companies like Meta and Google without their consent.

9.      That is because the improper sharing of such personal data has real world consequences.  The companies that traffic in this data—such as Defendants Meta and Google— are some of the largest tech companies in the world.  When these companies gain access to individuals' intimate, personal data (such as the data that Plaintiff shared here), they are able to exploit this sensitive data for their own benefit, including targeting individuals with advertising and reselling their sensitive data to additional third parties.

10.     No reasonable person would have expected that Perplexity would share complete transcripts of their conversations with Perplexity's AI Machine with companies like Meta and Google.  But that is what Perplexity did.

11.     Without Plaintiff's and Class Members' knowledge or consent, Perplexity disclosed their conversational dialogues with its AI Machine (the "Conversational Dialogues") via surreptitious tracking technologies that Perplexity surreptitiously deployed inside the software code for its AI Machine.

---

[4] *Id.*

[5] *Id.*

CASE NO. ―――――――――3:26-cv-02803     − 3 −

12.    For example, Perplexity incorporated the Facebook Meta Pixel, Google Ads, and Google Double Click into the code for its AI Machine.  These tracking technologies gather information from website visitors even if they do not have a Meta or Google account and forward that information surreptitiously to Meta, Google, and other third parties, who exploit that data for commercial purposes.  A separate but related technology, which Meta calls "Conversions API," also transmits web events and user interactions directly from Perplexity's AI Machine to Meta's servers.   Yet another tool, which Google calls Firebase Analytics and Google Firebase code, works similarly with mobile applications, like the mobile applications that Perplexity offers to the public.

13.    Consequently, the moment that a user landed on the home page at www.perplexity.ai, those tracking technologies downloaded cookies onto users' browsers and began sharing data with Meta and Google before users' had time to click a single button or enter a single prompt.

14.    Worse, once Plaintiff and Class Members began "conversing" with Perplexity's AI Machine, these tracking technologies surreptitiously shared their conversations with Meta and Google.  This happened to every user regardless of whether or not they signed up for a Perplexity account.

15.    Even more incredibly, Perplexity offers users who sign up for a Perplexity account the option to employ an "Incognito" mode when conversing with Perplexity's AI Machine.  But this "Incognito" mode does nothing to protect users from having their conversations shared with Meta and Google.  Even users who turned on the "Incognito" feature still had their conversations shared with Meta and Google, along with their email addresses and other identifiers that allowed Meta and Google to personally identify them.

16.    Meta and Google incorporated all this information into their existing data platforms to compile user profiles and target Plaintiff and Class Members with advertisements.

CASE NO. _____3:26-cv-02803    − 4 −

17.    In return for sharing all this sensitive data with Meta and Google, Perplexity received advertising and analytics benefits that it used for its own benefit.

18.    Disclosing the contents of an individual's communications without their consent is a crime in California.  Cal. Penal Code § 631.  Disclosing the contents of an individual's communications to a third party for the purpose of commercially exploiting their private information is also a serious invasion of privacy. *Krzyzek v. OpenX Techs., Inc.*, __ F.Supp.3d __ No. 25-CV-05588-SI, 2026 WL 206855, at *4 (N.D. Cal. Jan. 27, 2026)  ("The Court also agrees with various other lower courts that have found that engaging in unauthorized tracking and data collection, allowing it to compile detailed profile of each plaintiff's online web browsing activity – including highly sensitive browsing activity – tied to their email addresses and other personal identifiers is actionable.") (internal quotations omitted).

19.    Meta's and Google's access and use of this sensitive data can and does have profound consequences that Perplexity's users would never anticipate.  For example, armed with the knowledge that a Perplexity user is seeking treatment for cancer, Meta and Google can specifically target that individual with advertisements for medications, alternative treatments, pain relievers, and potential healthcare providers.  Because their sensitive health information was shared with Meta and Google, the user could then be targeted with advertisements that the user might find overwhelming, disturbing, or, in many instances, physically deleterious.

20.    The intimate health and financial information that users regularly share with Perplexity is some of the most private information about a user and was provided under the reasonable belief that their Conversational Dialogues with Perplexity's AI Machine would remain private.

21.    Meta and Google knew that the data collected and received from Perplexity's AI Machine included intimate personal health and financial data—but they did nothing to stop Perplexity from sharing this data because it is vital to their business models.  By continuing to

receive and use this data for their own business purposes, Meta and Google (as well as Perplexity) intentionally intruded upon Plaintiff's and Class Members' privacy.

22. If Plaintiff and Class Members had known that Perplexity would share their conversations with Meta and Google, they would not have used Perplexity's AI Engine.

23. Defendant's actions constitute an extreme invasion of Plaintiff's and Class Members' right to privacy and violate federal and state law.

24. This case is brought on behalf of Plaintiff and all Class Members in the United States whose Conversational Dialogues with Perplexity's AI Machine were shared with Meta and Google without their consent. Among other causes of action, Plaintiff alleges violations of state and federal privacy laws, including the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502; Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1, and the Electronic Communications Privacy Act, 18 U.S.C. § 2511, et seq.

25. Plaintiff continues to desire to use Perplexity's AI Machine. Plaintiff will continue to suffer harm if the AI Machine is not redesigned. If Perplexity's AI Machine were redesigned to comply with applicable laws, Plaintiff would use Perplexity's AI Machine in the future.

26. On behalf of himself and all similarly situated persons, Plaintiff seeks an order enjoining Perplexity from further unauthorized disclosures of personal information; awarding statutory damages in the amount of at least $5,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## II. PARTIES

### A. Plaintiff

27. Plaintiff ~~John Doe~~David Noel is citizen of Utah who is a Perplexity user. Initially, Plaintiff ~~John Doe~~ interacted with Perplexity's AI Machine as a guest user. When Plaintiff ~~John Doe~~ first visited Perplexity's website, he was given no notice that Perplexity had deployed surreptitious tracking technologies on its website, AI Machine, and inside its Mobile Application.

28. Because the Meta Pixel, Google Ads, and Google Double Click were all deployed on Perplexity's website at the time of ~~Plaintiff John Doe's~~Plaintiff's initial visit, Perplexity immediately began sharing ~~Plaintiff John Doe's~~Plaintiff's communications with Meta and Google as soon as he visited the Perplexity website for the first time. Plaintiff ~~John Doe~~ subsequently signed up for a "free" Perplexity account by registering with Perplexity via his email address.

29. Since becoming a Perplexity user, Plaintiff ~~John Doe~~ has used both Perplexity's AI Machine and its Mobile Application. During that time, Plaintiff ~~John Doe~~ has held multiple Conversational Dialogues with Perplexity's AI Machine regarding tax advice, legal advice, and investing. For example, Plaintiff ~~John Doe~~ has used Perplexity's AI Machine to conduct research about when he and his spouse could begin withdrawing social security. Plaintiff ~~John Doe~~ has also used Perplexity's AI Machine to research how he and his wife could convert savings from a taxable brokerage account into a Roth IRA. Plaintiff ~~John Doe~~ also used Perplexity's AI Machine to research potential stock trades and analyze stock prices and values, including for publicly traded Cannabis companies. Plaintiff ~~John Doe~~ also held Conversational Dialogues with Perplexity's AI Machine regarding the percentage of shares that Canadian companies can buy back within a single year.

30. Because the tracking technologies were on Perplexity's website and inside Perplexity's AI Machine when he first visited, and because those technologies operated uniformly throughout the Class Period, all of ~~Plaintiff John Doe's~~Plaintiff's Conversational Dialogues—both those he shared as Guest user and those he shared as a Subscribed user—were shared with Meta and Google without his consent.

31. ~~Plaintiff John Doe's~~Plaintiff's communications with Perplexity's AI Machine included personal information about his family's finances, his tax obligations, his investment portfolio, and his investment strategies. Plaintiff ~~John Doe~~ believed that these communications with Perplexity's AI Machine were private and that Perplexity would not share his communications with third parties like Meta and Google. Plaintiff ~~John Doe~~ was dismayed to

CASE NO. ~~_____~~3:26-cv-02803     – 7 –

discover that complete and partial transcripts of his communications with Perplexity were shared with Meta and Google every time that he interacted with Perplexity's AI Machine.

**B. Defendants**

32.     Defendant Perplexity AI, Inc. ("Perplexity") is a Delaware corporation with its principal place of business at 115 Sansome Street, Suite 900, San Francisco, California 94104. Perplexity is one of the largest AI companies in the world, and regularly conducts business in this district.

33.     Defendant Meta Platforms, Inc. ("Meta" or "Facebook") is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025.  Meta does business throughout the United States, deriving substantial revenue from interstate commerce.

34.     Defendant Google, LLC ("Google") is a Delaware Limited Liability Company with its principal place of business at 1600 Amphitheater Parkway, Mountain View, California 94043.  Google regularly conducts business throughout the United States and in this judicial district.  Google is one of the largest technology companies in the world, and regularly conducts product development, search, and advertising operations in this district.

## II. JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 putative class members defined below, and minimal diversity exists because at least one class member and one Defendant are citizens of different states.

36.     This Court has federal question jurisdiction pursuant to 29 U.S.C. § 1331 because this complaint alleges violation of federal laws and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state common-law and statutory claims as these state law claims are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

37. This Court has personal jurisdiction over Perplexity AI because it conducts business in this County and throughout the state of California and because its principal place of business is in this County.

38. This Court has general personal jurisdiction over defendants Meta and Google, because they are California corporations and limited liability companies with headquarters located in California. Additionally, these defendants are subject to specific personal jurisdiction in this State because (1) a substantial part of the events and conduct giving rise to Plaintiff's and Class Members' claims occurred in this State; (2) both Meta and Google purposely directed their activities towards citizens of the state of California and purposely availed themselves of the privilege of conducting activities within the state of California, thereby invoking the benefits and protections of California law; (3) Plaintiff's and the Class Members' claims both arise out of and relate to Meta and Google's California-related activities; and (4) the exercise of this Court's jurisdiction comports with fair play and substantial justice

39. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Perplexity AI transacts business and is headquartered in this District, because Perplexity AI is subject to the Court's personal jurisdiction with respect to this action, because Meta and Google are subject to the Court's personal jurisdiction with respect to this action, and because a substantial portion of the events and omissions giving rise to the claims occurred in this District.

40. Intra-District Assignment: Venue is also appropriate in this District because a substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the County of San Francisco, and as such, this action may be properly assigned to the San Francisco division of this Court pursuant to Civil Local Rule 3-2(c).

### III. FACTUAL BACKGROUND

**A. Perplexity's AI Machine**

41. Perplexity operates an AI-powered search engine and conversation platform (the "AI Machine") that uses large language models (LLMs) to chat with users. Perplexity touts its

AI Machine as a conversational "answer engine" that promises to provide users with guidance, research, and advice.

42.    Perplexity was founded in San Francisco, California in 2022.  Over the last four years, Perplexity has raised more than $1.5 billion in funding, including high-profile investments from Nvidia and Jeff Bezos.  In September 2025, Perplexity secured $200 million in a new round of funding, raising its current valuation to $20 billion.

43.    The core feature of Perplexity's AI Machine is a conversation platform through which users conduct private conversations and receive responses designed to mimic natural, human language, generated by a technology known as a large language model (LLM).

44.    Perplexity's AI Machine is designed for interactive communications with users resembling human conversations.

45.    When users first go to the Perplexity website located at www.perplexity.ai, they are presented with a simple interface that invites them to begin conversing with Perplexity's AI Machine:

CASE NO. ———————————3:26-cv-02803    − 10 −

46.     First time visitors to Perplexity's website are not required to sign up for an account or otherwise agree to any terms or conditions.  These "Guest Users" can simply start interacting with Perplexity's AI Machine, asking questions, entering prompts, uploading documents, and directing Perplexity's AI Machine to assist them with an essentially unlimited set of tasks—from drafting proposals, to researching health conditions, to evaluating retirement and investment strategies, to creating journals, even to seeking mental health and wellness counseling.

47.     Recent studies examining datasets containing millions of interactions between real users and AI conversation platforms have found that the vast majority of these interactions include the disclosure of personal information.

48. Plaintiff and Class Members who visited and used Perplexity's AI Machine understandably thought they were communicating only with Perplexity.

49. Unbeknownst to Plaintiff and Class Members, however, Perplexity had embedded undetectable tracking software (the "Tracking Technologies") inside its AI Machine, which automatically transmitted to Meta, Google, and other third parties the contents of their conversations with Perplexity's AI Machine—no matter how sensitive.

50. Operating as designed and as implemented by Perplexity, these Tracking Technologies allowed Plaintiff's and Class Members' conversations to be unlawfully disclosed to Meta, Google, and other third parties, along with users' unique and persistent identifiers, including their Facebook IDs, IP addresses, and email addresses.

51. Simply put, by installing Tracking Technologies inside its AI Machine, Perplexity effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their confidential communications to Meta and Google.

52. The information sent to third parties as a result of these Tracking Technologies included private information that Plaintiff and Class Members shared with Perplexity such as health, financial, and legal information.  Plaintiff and Class Members intended that such private information would only be shared with Perplexity.  They neither consented nor knew that Perplexity was sharing their sensitive conversation histories with Meta and Google.

53. In addition to tracking pixels, Perplexity, on information and belief, also installed and implemented Meta's Conversions Application Programming Interface ("CAPI") on its servers.

54. Unlike the Meta Pixel, which coopts a website user's browser and forces it to transmit information to Meta in addition to the website owner's server, CAPI does not cause the user's browser to transmit information directly to Meta. Instead, CAPI tracks the user's website interactions, including private information, records and stores that information on the website owner's servers, and then transmits the data to Meta from the website owner's servers.

CASE NO. _____3:26-cv-02803   − 12 −

55.    Indeed, Meta markets CAPI as a better measure of ad performance, which helps website owners to better understand how digital advertising impacts both online and offline results.

56.    Because CAPI is located on the website owner's servers (rather than a bug placed on website users' browsers), it allows companies like Perplexity to circumvent any ad blockers or similar technologies that users might employ to prevent Perplexity from sharing their personal information with Meta.

57.    Despite the clear and unequivocal prohibitions on the disclosure of sensitive communications without consent, Perplexity chose to use the Meta Pixel and CAPI data for marketing purposes in an effort to bolster its profits. In other words, Perplexity put its own desires for profit over its user's privacy rights.

58.    The Meta Pixel and CAPI are routinely used to target specific customers by utilizing data to build robust profiles for the purposes of retargeting and future marketing. Meta also uses Plaintiff's and Class Members' private information to create targeted advertisements based on the medical conditions, financial information, and other sensitive information disclosed to Perplexity.

59.    Users of interactive conversation platforms like Perplexity's AI Machine simply do not anticipate that their confidential communications to an unauthorized third party—let alone Meta, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without consumer's informed consent.

60.    Neither Plaintiff nor any other Class Member signed a written authorization permitting Perplexity to send their private information to Meta and Google so that those companies could commercially exploit that information.

61.    Plaintiff and Class Members exchanged numerous communications with Perplexity.

62.     Notwithstanding users' reasonable expectations of privacy and Perplexity's legal duties of confidentiality, Perplexity disclosed (and continues to disclose) the contents of Plaintiff's and Class Members' communications via automatic mechanisms embedded inside its AI Machine.  In doing so, Perplexity systematically violated the privacy rights of Plaintiff and Class Members by causing the unauthorized disclosure of their communications to be transmitted to Meta, Google, and other third-party marketing companies.

63.     The private information provided by Plaintiff and Class Members has been—and likely will be—further disseminated to additional third parties.

64.     While Perplexity intentionally incorporated the Meta Pixel and other Tracking Technologies into its AI Machine, Perplexity never disclosed to Plaintiff or Class Members that it was sharing their sensitive and confidential communications with Meta and Google.  As a result, Plaintiff and Class Members were unaware that their private information was being surreptitiously transmitted to Meta and Google when they used Perplexity's AI Machine.

65.     By design, none of the tracking mechanisms employed by Perplexity are visible to users visiting Perplexity's website.

66.     Perplexity did not warn or otherwise disclose to Plaintiff and Class Members that it regularly bartered users' confidential communications to Meta, Google, and other third parties for marketing purposes.

67.     Plaintiff and Class Members never consented, agreed, or otherwise authorized Perplexity to disclose their confidential communications.

68.     Perplexity interfered with Plaintiff's and Class Members' privacy rights when it implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential information to Meta, Google, and other third parties.

69.     Perplexity also breached its obligations to users in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Meta, Google, and other third parties, (2) failing to adequately review its marketing programs and web-based technology

to ensure their websites were safe and secure, (3) failing to remove or disengage software code that was known and designed to share users' private information with third parties, (4) failing to take steps to block the transmission of Plaintiff's and Class Members' private information to Meta, Google, and other third-party advertising companies, (5) failing to warn Plaintiff and Class Members that it was routinely bartering their private information to Meta via the Meta Pixel, and (6) otherwise ignoring Perplexity's common law and statutory obligations to protect the confidentiality of users' communications.

70.    Plaintiff and Class Members have suffered injury because of Perplexity's conduct. Their injuries include invasion of privacy and the continued and the ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B. Perplexity's surreptitious collection and disclosure of users' Conversational Dialogues with its AI Machine.**

71.    Perplexity tells the public that its AI Machine is a "free AI-powered answer machine that provides accurate, trusted, and real-time answers to any question." What a first-time visitor to Perplexity's AI Machine would not know is that Perplexity has deployed various Tracking Technologies—including the Meta Pixel, Google DoubleClick, and Google Ads—inside its AI Machine. Perplexity uses these Tracking Technologies to collect users' conversations with its AI Machine, along with their IP addresses and other identifiable information, such as email addresses, persistent cookies and geo-location data, and surreptitiously shares this information with third parties, including Google and Meta.

72.    Likewise, Perplexity similarly deployed Google Analytics and Google Firebase code within the mobile application (the "Mobile Application") that it offers the pubic. Collectively, the Google Double Click, Google Ads, Google Firebase, and Google Analytics tracking technologies (the "Google Tracking Technologies") that Perplexity deployed on its website and Mobile Application resulted in a vast and comprehensive amount of its users' data being shared with Google.

73.     By deploying these tracking technologies inside its website, AI Machine, and its Mobile Application, Perplexity surreptitiously collected and shared with Meta, Google and others the contents of users' private conversations with its AI Machine, which in many cases included sensitive information, without users' knowledge or consent, including but not limited to the following:

- Users' opening prompt that initiates each conversation—even when Perplexity subscribers are in "Incognito Mode";

- Follow up questions that users click on from a set of options provided within the Conversational Dialogue by Perplexity;

- Users' sign-up email addresses; and

- Every conversation URL, containing both the users' initial prompts and, for non-subscribed users, a URL through which the *entire* conversation may be accessed by third parties like Meta and Google.

74.     Nothing on Perplexity's website warns users that their conversations with its AI Machine will be shared with Meta and Google.  Much less does Perplexity warn subscribed users that its "Incognito Mode" does not function to protect users' private conversations from disclosure to companies like Meta and Google.

**C.  How the Tracking Technologies that Perplexity deployed inside its AI Machine capture and disclose users' conversations to Meta and Google.**

75.     When a user visits Perplexity's website for the first time, their browser sends an HTTP request to the website's server to load the page. In response, Perplexity's server sends back the webpage, which contains small pieces of code known as trackers or pixels.

76.     A tracking pixel is a script that runs in the background and collects information about the user. The tracker instructs the browser to send users' IP address, along with other identifying data like cookies, browser details, and device information, to a third-party tracking service. This allows the tracker to monitor user activity and gather insights about the users' behavior on the site.

CASE NO. ——————————3:26-cv-02803    − 16 −

77. All of this happens instantaneously, the first time that a user makes an HTTP request to access Perplexity's website. Without any warning (much less any consent by users), the source code that Perplexity embedded inside its website automatically and instantaneously downloads tracking pixels on its users' browsers, which then hijack those browsers, and instruct them to begin sharing all future communications between users and Perplexity with Meta and Google.

78. For example, Meta offers website owners like Perplexity an analytics and advertising tool called the "Meta Pixel," which allows the owners to track users' actions on their website and measure the effectiveness of advertising by adding Meta Pixel's source code to their website. Once the Meta Pixel is deployed in a website's source code, it redirects the information about actions taken by the user to Meta.

79. Meta intercepts user data via a specific cookie named the "c_user" cookie. This cookie is directly linked to a user's Facebook profile if they have logged into their Facebook account on the same browser.

80. The c_user cookie serves as a unique identifier for an individual's Facebook account. Anyone with access to this cookie can easily locate and view the associated Facebook profile by appending the identifier to the Facebook URL. For example, if the c_user identifier is 98768765, the corresponding profile can be accessed via the URL www.facebook.com/98768765. The identifier corresponds to a username like john.doe.123 and the resulting profile URL would be www.facebook.com/john.doe.123. The c_user cookie allows Meta to personally identify the user and link their activity on the website they browsed to their social media profile.

81. Likewise, a second cookie that Meta downloads onto users' browsers is the "fr" cookie.

82. The fr cookie is a browser cookie utilized by Meta to facilitate targeted advertising and gather analytics. This cookie contains a unique identifier that enables Meta to track users' activities across various websites and devices, thereby collecting data on user behavior and

preferences. Unlike the c_user cookie, which specifically identifies logged-in Facebook users, the fr cookie identifies both Facebook users and non-Facebook users, allowing Meta to track individuals even if they do not have an active Facebook account.

83.     Via the fr cookie, Meta can collect information such as visited websites, button clicks, interactions with content and more, which contributes to building detailed user profiles. Over time, as the fr cookie collects more data, Meta can refine and expand the profile, enabling it to serve highly targeted advertisements based on a user's habits and preferences.

84.     Perplexity also deployed both Google DoubleClick and Google Ads on its website and inside its AI Machine.

85.     These Google Tracking Technologies—which are both advertising tools—work in a similar fashion to the Meta Pixel.

86.     Google collects user data through services such as Google DoubleClick, allowing website owners to enhance user experience, personalize content, and implement effective targeted advertising. DoubleClick, a digital advertising company acquired by Google, has been fully integrated into Google's advertising ecosystem as part of the Google Marketing Platform. DoubleClick technologies automate the ad buying process and use collected data for targeted advertising initiatives.

87.     DoubleClick is an advertising tracking tool designed to collect information about user behavior on websites for the purpose of improving the targeting and effectiveness of advertising campaigns. It builds independent user profiles to optimize ad targeting and does not rely on users having pre-existing Google accounts.  DoubleClick enables advertisers to integrate tracking codes into their websites. The data collected, combined with information from HTTP requests, helps create targeted ads.

88.     DoubleClick collects user data via the IDE cookie.  The IDE cookie is a persistent advertising identifier. It is used to build user profiles for cross-site ad targeting and plays a central role in tracking users' interactions across the web. The IDE cookie enables the measurement of

advertising effectiveness by tracking actions users take after viewing or clicking on advertisements, such as visiting specific pages or completing transactions.

89.    Likewise, Google Ads is Google's advertising platform that allows businesses, organizations, and advertisers to reach users across the Google ecosystem. The platform supports various campaign types such as search ads, display ads, shopping ads, and video ads. Advertisers can define audiences, track conversions, and optimize campaigns based on user engagement signals and behavioral data.

90.    Google Ads uses a set of third-party cookies (e.g., 3PSID, 3PAPISID, 3PSIDCC, and NID) to track user behavior across websites and link it to advertising audiences and targeting signals. These cookies allow Google to create more comprehensive user profiles, enabling Google to associate web activity with authenticated accounts. Because these are third-party cookies, the data collected does not remain within the originating website but is transmitted directly to Google's advertising infrastructure for purposes such as ad personalization and measurement.

91.    The '3PSID', '3PAPISID', and '3PSIDCC' cookies are used to identify users by linking their browsing activity to their Google account when they are signed in.  The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in.

92.    When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the HMH Website) can be linked by Google to an identifiable email address. Many users also voluntarily provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email— either during account creation or while using other Google services. As a result, Google can associate the data collected alongside the cookies not only with an email address, but also with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on a website such as HMH's to their name and broader aspects of their digital

CASE NO. _____3:26-cv-02803   − 19 −

identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

93.    By contrast, the 'NID' cookie collects information from users even when they are not signed in or have never created a Google account. This cookie enables Google to track user behavior across websites regardless of authentication status, using browser-level identifiers to support ad delivery and preference management in anonymous sessions.

94.    The way that Perplexity and Google configured the Google Ads technology on Perplexity's website and AI Machine resulted in tracking and remarketing requests related to Google Ads being routed through the www.google.com domain. Despite being served from a seemingly general-purpose domain, these requests participate directly in audience building, ad targeting, and conversion tracking.  Consequently, the data transmitted to www.google.com in this context is not simply passive or generic, but contributes to Google's advertising infrastructure, even when no visible ad is rendered.

**D. Perplexity shares volumes of sensitive conversations from both subscribed and unsubscribed users alike via the Tracking Technologies deployed on its AI Machine.**

95.    The Tracking Technologies that Perplexity deployed on its AI Machine share enormous volumes of sensitive information from both subscribed and unsubscribed users.

96.    When a potential user visits Perplexity's website for the first time, they are presented with the interface for Perplexity's AI Machine as shown below and invited to begin conversing.[6]



97.    No privacy policy or terms and conditions appear anywhere on the page presented to new users.  Nor are new users required to login or sign up for an account to begin interacting with Perplexity's AI Machine.  New Guest Users can simply start typing queries into Perplexity's AI Machine, which then triggers a Conversational Dialogue between the user and Perplexity.

98.    For an example a new, unsubscribed user (a "Guest User") can initiate a conversation with the following, opening prompt:  "I suffer from social anxiety disorder, what can I do about it?"

---

[6] *See also* **Exhibit 1** (attaching larger image of Perplexity.ai homepage as it appeared on February 4, 2026).

CASE NO. ——————————3:26-cv-02803    − 21 −



99.     As illustrated below, when an unsubscribed user entered such a prompt, Perplexity shared the user's prompt with third parties, along with uniquely identifying third-party cookies which are linked to the user's profile on Google and Facebook.  The number of characters that Perplexity shared from a user's initial prompt typically ranged from approximately 70–100 characters.

100.     For example, in the example below, the Guest User's entire initial prompt— "I suffer from social anxiety disorder, what can I do about it?"—was shared with Meta.

101.    Shockingly, when unsubscribed users interacted with Perplexity's AI Machine, the full URL of each Conversational Dialogue conducted by the unsubscribed users is publicly accessible—meaning that third parties who received the URL (including Meta and Google) are able to access the entire conversation.

102.    Perplexity offers unsubscribed users the ability to "share" their Conversational Dialogues via a "Share" button as shown below:



103.    A user who clicks on the "Share" button is given the option to either keep the conversation "Private" or to create a link, allowing the conversation to be shared with others:



104.    The configuration of Perplexity's AI Machine is highly misleading because, for unsubscribed Guest Users, the Conversational Dialogues are automatically configured to be shared (as opposed to "Private") by default.  Guest Users were thus presented with a false choice regarding whether they wanted to "share" their conversations because, in fact, their conversations had already been immediately shared with Meta and Google before users ever clicked on the "Share" button.   In reality, Guest Users were given no choice—Perplexity shared the complete transcripts of their Conversational Dialogues every time they interacted with Perplexity's AI Machine.

105.    The disclosures of Subscribed Users' communications—i.e., users who have created a free account with Perplexity by (a) providing an email address, (b) associating their Perplexity account with their Apple account, or (c) associating their Perplexity account with their Google account—communications are equally disturbing.

106.    As with unsubscribed, Guest Users, when Subscribed Users entered an initial conversational prompt in Perplexity's AI Machine, the Tracking Technologies that Perplexity had deployed shared the subscribed user's prompt with Meta and Google, along with uniquely identifying third-party cookies which are linked to the user's profile on Google and Facebook. Again, the number of characters that Perplexity shared from a subscribed user's initial prompt typically ranged from approximately 70–100 characters.

107.    For example, a Subscribed User who entered a prompt such as "What is the best treatment for liver cancer?" would have had their entire prompt shared with Meta and Google via a full-string URL which was intercepted inside the user's browser, then transmitted to Meta and Google.

108.    Nor were just the Subscribed Users' opening conversational prompts shared with Meta and Google.

CASE NO. _____3:26-cv-02803    − 24 −

109.    After each response in the conversation, Perplexity offers five different follow-up questions that the user can click on. In this way, the user may conduct an entire conversation using the Interface without even typing.

110.    For example, in response to the prompt, "I suffer from social anxiety, what can I do about it?", Perplexity offers multiple follow up questions, including (1) What are the best CBT exercises for social anxiety, (2) What medications are prescribed for social anxiety, (3) How to find free or low-cost CBT therapy near me, (4) What are common self-exposure techniques for social phobia, and (5) How effective is group therapy for social anxiety."



111.    A user who clicks on any of the follow-up questions posed by Perplexity is then shown additional follow-up questions.  For example, when a user clicked on "What medications are prescribed for social anxiety," they were then provided with additional follow-up questions such as "What are common side effects of SSRIs like Zoloft and Paxil?"

112. Each time Subscribed (or unsubscribed) users clicked on the follow-up questions, the exact text of the follow-up questions was shared in real-time with Meta and Google, along with uniquely identifying cookies, including the Facebook c_user cookie. Accordingly, Meta and Google were not only given the "contents" of users' conversations but they were also told the real-world identities of users, which Meta and Google then associated with all of the conversational data with for purposes of selling advertising.

113. Just as shockingly, for users who signed-up or signed-in with email addresses, Perplexity also sent Meta and Google the email addresses used by subscribed users to register (along with a host of additional identifying information captured by the Tracking Technologies).

**E. Perplexity misleadingly offers an "Incognito" mode to subscribed users.**

114. Perplexity's misrepresentations and privacy violations do not stop with just sharing its Subscribed Users' and Guest Users' Conversational Dialogues with Meta and Google.

115. For Subscribed Users, Perplexity also purports to offer logged-in users the ability to converse with its AI Machine in "Incognito" mode, which Perplexity falsely claims creates "anonymous threads." Subscribed Users can activate "Incognito" mode by clicking on an icon button that Perplexity offers on its AI Machine:



116. When a Subscribed User clicks on the "Incognito" button, they are told that "You're incognito." Perplexity also promises that "[t]hreads you create won't save to your history and expire after 24 hours."

CASE NO. ————————————3:26-cv-02803  − 26 −



117.    What Subscribed Users were not told was that—even in "Incognito" mode—Perplexity's AI Machine shared the contents of their prompts in real-time with Meta and Google, along with personally identifying information such as users' email addresses and unique cookie identifiers tying users to their Meta and Google accounts.

118.    For example, as shown below, a Subscribed User conversing with Perplexity's AI Machine in Incognito mode who asked, "I am pregnant and have no health insurance.  what are the implications," would have had their entire prompt shared with Meta, along with their C_user cookie and email address[7]:



119.    No reasonable person using "Incognito" mode when conversing with Perplexity's AI Machine would have suspected or believed that Perplexity was nevertheless sharing every prompt they entered in Perplexity's AI Machine with Meta and Google.  Nor has Perplexity ever provided Subscribed Users with any express notice that the contents of users' conversations in

---

[7] *See* Exhibit 2 (attaching larger image).

Incognito mode would be shared with Meta and Google so that those companies could exploit that data for advertising purposes.

**F. Users tend to disclose deeply personal and sensitive information when conversing with AI conversation engines like Perplexity's AI Machine.**

120.    The use of AI conversation platforms like Perplexity's AI Machine is becoming ubiquitous in modern society, with millions of people turning to them daily, weekly, and monthly for help with their most sensitive and private issues. Peer-reviewed studies, national polls, and industry surveys uniformly show that numerous individuals across the country turn to AI Machines for help with such things as their health and medical issues, mental health support and therapy, financial advice, legal advice, relationship issues, and the like. Studies further confirm that many users of AI Machines turn to them for the specific purpose of seeking help with issues they are reluctant to disclose to or discuss with another human being. In other words, these users discuss such issues with AI Machines like Perplexity's precisely because of the anonymity or confidentiality—or so they believe—of the platform.

121.    Unsurprisingly, studies also show that users routinely disclose personal—and often deeply sensitive—information when conversing with interacting with large language model ("LLM") conversation engines like those offered by Perplexity, ChatGPT (Open AI), and Claude (Anthropic).

122.    Academic analyses of real-world conversation logs demonstrate that personal data appears in the majority of chatbot interactions, even in ostensibly low-risk tasks.[8] Importantly, this disclosure extends well beyond traditional personally identifiable information (PII) to include sensitive content such as mental health struggles, sexual topics or financial details, and private communications about third parties. These findings suggest that standard PII-focused safeguards substantially underestimate the privacy risks inherent in chatbot usage.

---

[8] Mireshghallah, N., Antoniak, M., More, Y., Choi, Y., & Farnadi, G. (2024). *Trust no bot: Discovering personal disclosures in human-LLM conversations in the wild*. arXiv. https://doi.org/10.48550/arXiv.2407.11438

123. Studies further indicate that this level of disclosure is not accidental but reflects how users socially engage with LLM conversation engines.[9] Indeed, studies show that users tend to treat chatbots like Perplexity AI as social actors and disclose personal information to them at rates comparable to disclosures made to human interlocutors, particularly when the system presents human-like cues or is framed as a social conversational partner.[10]

124. Taken together, these studies point to a consistent conclusion: LLM conversation engines elicit substantial personal disclosure by default, including information that users themselves perceive as sensitive and users have a reasonable expectation of privacy in their communications with these LLM platforms.

125. These studies are directly relevant to understanding users' reasonable expectations when conversing with LLM-powered search and answer engines such as Perplexity, which combine conversational interaction with information retrieval. Like other conversation-based systems, Perplexity invites users to phrase queries in natural language, often embedding personal context, background facts, or sensitive details to obtain better answers. Academic research suggests that users are likely to *over*-disclose in this setting—especially when queries resemble advice-seeking, research assistance, or exploratory reasoning rather than traditional keyword search.

126. For example, studies show that roughly one in five online health information seekers used an AI Machine in a given year for help with their health and medical issues, and about half of those who did followed at least some of the advice the AI Machine provided. A 2025 cross-sectional web survey of online crowd workers found that 21.2% used an AI Machine (*e.g.*, ChatGPT, Copilot, or Perplexity) for health information in the prior year, and 48.4% of those

---

[9] Warren-Smith, G., Laban, G., Pacheco, E.-M., & Cross, E. S. (2025). *Knowledge cues to human origins facilitate self-disclosure during interactions with chatbots. Computers in Human Behavior: Artificial Humans*, 5, 100174. https://doi.org/10.1016/j.chbah.2025.100174

[10] Park, Y. J., & Woo, H. (2022). *Self-disclosure to AI: People provide personal information to AI and humans equivalently. Computers in Human Behavior*, 133, 107246. https://doi.org/10.1016/j.chb.2022.107246

users reported following the AI Machine's advice at least once.[11] A large nationally representative U.S. poll KFF conducted in 2024 in found similar results: in June 2024, 17% of U.S. adults—and 25% of adults under 30—reported using AI Machines at least monthly for health information or advice.[12]

127.    Users seeking emotional or mental health support from AI Machines are more likely than average to report that they experience loneliness, social anxiety, or other barriers to more traditional care in their ordinary lives. They report seeking emotional or mental health support from AI Machines precisely because of the anonymity and non-judgmental listening they provide, as well as their 24/7 availability and lack of waiting lists or costs.[13] Users also describe the desire to practice social skills or explore identity in a private and non-stigmatizing space as being a key motivator of many such interactions.[14] Studies confirm that many users specifically and intentionally turn to AI Machines for issues they are reluctant to discuss with other humans, including such things as relationship advice, companionship, and sexual or identity exploration.[15] Many such users engage in multi-hour daily conversations, motivated by the perceived intimacy and privacy of the platform, and self-reported gains in mood, confidence, or social skills practice.[16]

128.    With regard to personal finance, reputable surveys find that a substantial fraction of Americans consult AI Machines for budgeting, taxes, or investment questions, and in many cases report that it influenced their decisions. For example, a widely reported CNBC article in April 2024, based on a February survey of roughly 1,000 U.S. adults, found that 14% had used

[11] Yun & Bickmore, Journal of Medical Internet Research, March 31, 2025

[12] KFF Health Misinformation Tracking Poll, August 15, 2024

[13] https://pmc.ncbi.nlm.nih.gov/articles/PMC12575814/

[14] https://pmc.ncbi.nlm.nih.gov/articles/PMC12575814/

[15] https://pmc.ncbi.nlm.nih.gov/articles/PMC12575814/

[16] https://journals.sagepub.com/doi/10.1177/17456916251351306

CASE NO. ——————————3:26-cv-02803   − 30 −

ChatGPT to review their taxes.[17] Broader finance usage is confirmed by multiple nationally marketed surveys: LendingTree's 2025 survey reported that 26% of AI Machine users turned to them for financial information, 49% said the tool influenced at least one financial decision, and nearly a third used them for tax questions;[18] Credit Karma's early 2025 polling, reported by major outlets, likewise indicated that roughly two-thirds of respondents who had tried AI Machines had used them for financial advice, with a large majority of those claiming the advice improved their finances.[19]

129.    As with their physical and mental health, Americans using AI Machines for assistance with their personal finances report the ability to ask "embarrassing" or basic questions privately without stigma as being a primary motivation.[20] They also value the 24/7 access and the ability to receive quick, step-by-step guidance for tasks like budgeting, debt management, and tax form navigation that the platforms provide.[21]

130.    Many Americans also employ AI Machines for other private matters such as legal and relationship issues.[22] In these and all the above contexts, users consistently report the anonymity or privacy of the platforms, which, users believe, provide judgment-free responsiveness and the ability to disclose sensitive information without fear of embarrassment. In all of these cases, there is all the more reason users should be "suspicious of everything" where the details of their most personal, intimate, and private matters are disclosed by Perplexity's

---

[17] https://www.cnbc.com/2024/04/06/heres-what-to-know-before-using-ai-chatbots-to-file-your-taxes.html

[18] https://www.lendingtree.com/credit-cards/study/ai-chatbot-users/

[19]    https://www.creditkarma.com/about/commentary/the-rise-of-fin-ai-why-americans-are-trusting-generative-ai-with-their-wallets

[20]    https://www.creditkarma.com/about/commentary/the-rise-of-fin-ai-why-americans-are-trusting-generative-ai-with-their-wallets; https://www.empower.com/the-currency/money/ai-financial-guidance-risks-why-humans-lead-news

[21]    https://www.creditkarma.com/about/commentary/the-rise-of-fin-ai-why-americans-are-trusting-generative-ai-with-their-wallets; https://www.empower.com/the-currency/money/ai-financial-guidance-risks-why-humans-lead-news

[22]    https://theconversation.com/people-trust-legal-advice-generated-by-chatgpt-more-than-a-lawyer-new-study-252217

CASE NO. ————————————3:26-cv-02803    − 31 −

Tracking Technologies to numerous third-party advertising companies without regard for users' expectations of privacy or Perplexity's legal obligations to keep these conversations confidential.

**G. The nature of Defendants' unauthorized interception, disclosure, and exploitation of users' communications.**

131.    Defendants' interception and disclosure of Plaintiff's and Class Members' communications occurred because Perplexity intentionally deployed tracking pixles   on Perplexity's AI Machine, which caused both Subscribed and Guest Users' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

132.    These tracking pixels are snippets of code that track internet and app users as they navigate through a website, logging which pages they visit, which buttons they click, and certain information they enter into forms. In exchange for installing the pixels, third party platforms (*e.g.,* Meta and Google) provide website owners with analytics about the advertisements they have placed as well as tools to target people who have visited their online businesses.

133.    By design, third parties receive and record the exact contents of these communications before the full response from Perplexity has been rendered on the screen of the user's computer device and while the communication with Perplexity remains ongoing.

134.    While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just a user's prompts but also their first name, last name, and email address. In addition, that data is linked to a specific internet protocol ("IP") address.

135.    The Facebook Meta Pixel, for example, sends information to Meta via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

136.    The Meta Pixel allows Meta to track people and the actions they take on websites. When Meta Pixel is installed on a website like that maintained by Perplexity, the information that

CASE NO. _____3:26-cv-02803    − 32 −

Meta receives may include such information as the user's prompt history, their name, their home address, and their geographic location.

137.    When combined with other information that Meta receives via the Meta Pixel, Meta often learns intimate details about Perplexity's users, including their medical conditions, sexual preferences, finances, and relationships.

138.    In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

139.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering private information, like Meta, implement workarounds that cannot be evaded by savvy users. Meta's workaround, for example, is called Conversions API (CAPI). CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Meta]." Thus, the communications between users and Perplexity, which are necessary to use Perplexity's AI Machine, are actually received by Perplexity and stored on its server before CAPI collects and sends the private information contained in those communications directly from Perplexity to Meta. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

140.    While there is no way to confirm with certainty that a Web host like Perplexity has implemented workarounds like CAPI without access to the host server, companies like Meta instruct companies to use the CAPI in addition to the Pixel, and share the same events using both tools because such a redundant event setup allows website owners to share website events with Meta that the pixel may lose. Thus, it is reasonable to infer that Meta's customers who implement

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIALCORRECTED ORIGINAL CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the Meta Pixel in accordance with Meta's documentation will also implement the CAPI workaround.

141. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

142. Thus, without any knowledge, authorization, or action by a user, website owners like Perplexity can use their source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

143. For example, when Plaintiff or a Class Member accessed Perplexity's AI Machine, the Meta Pixel software deployed inside the AI Machine directed their browsers to send a message to Meta's servers. The information that Perplexity shared with Meta included the personal information that Plaintiff and Class Members communicated to Perplexity, including the transcripts of their Conversational Dialogues.

144. Such private information allows third-party advertising companies like Meta to determine, for example, that a specific user was seeking information from Perplexity's AI Machine about a specific type of confidential medical treatment. This kind of disclosure also allows Meta to reasonably infer that a specific user was being treated for specific types of medical conditions, such as cancer, substance abuse treatment, or depression.

145. Websites like those maintained by Defendants are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

146. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

147. Web browsers are software applications that allow users to exchange electronic communications over the internet. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

148. Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

> **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

> **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

> **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

149. A user's HTTP Request essentially asks a website host's server to retrieve certain information (such as a specific website page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on a user's screen as they interact with the website).

150.    In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

151.    In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

152.    A web page consists primarily of "Markup" and "Source Code."  The markup of a web page comprises the visible portion of that web page.  Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen.  The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

153.    For example, typing www.google.com into a web browser sends an http request to the website, which returns a HTTP response in the form of the home page of the website



154.    The user visiting this particular web page only sees the Markup, not the Source Code or underlying HTTP Requests and Responses.

CASE NO. ————————————3:26-cv-02803    − 36 −

155.    Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen.

156.    In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[23] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with users' personally identifiable information like their Facebook IDs.

157.    For example, Perplexity's websites include software code that transmits HTTP requests *directly* to Google, including user's sensitive information, every time a user interacts with Perplexity's AI Machine.

158.    A vast amount of data is communicated back and forth between a client's browser, Perplexity's servers, and Google's servers anytime that a user makes a HTTP request to view a specific page on a website where Google DoubleClick and/or Google Ads tracking technologies are deployed.

159.    A web page load is not just the product of a couple of communications between a user's browser and a website server. A web page load involves tens or even hundreds of requests between a user's browser and the website server to load individual pages. The interception and sharing of communications content with Google happens contemporaneously in real time with the page load while the communications between a user's browser and the website's server are in transit:

---

[23] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.



160.    Google's DoubleClick and Google Ads tracking technologies intercept communications content such as full-string URLs using hooks/APIs (e.g., listeners) that are surreptitiously deployed inside user's browsers via cookies.  Those technologies then share every communication that users make with Google.

161.    In essence, Perplexity encourages the public to use a tapped device, and once the Webpage is loaded into a user's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Perplexity and transmits those communications to third parties, including Meta and Google.

162.    Third parties, like Meta, place third-party cookies in the web browsers of users logged into their services.

163.   These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the user associated with the Personal Information intercepted.

164.   The basic command that web browsers use to exchange data and user communications is called a GET request. For example, when a patient types "heart failure treatment" into the search box on a hospital website and hits 'Enter,' the patient's web browser makes a connection with the server for the hospital's website and sends the following request: "GET search/q=heart+failure+treatment."

165.   The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

166.   In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

167.   Unbeknownst to most users, however, a website's server may also transmit the user's communications to third parties.  For example, the Meta Pixel that Perplexity deployed on its AI Machine is programmed to manipulate users' browsers so that their communications with Perplexity were automatically, contemporaneously, and surreptitiously sent to Meta.  When Plaintiff and Class Members visited Perplexity's website for the first time, the Meta Pixel source code that Perplexity had installed on its AI Machine instructed Plaintiff's and Class Members' browsers to begin sending duplicate GET and POST requests to Meta every time that Plaintiff and Class Members subsequently interacted with the AI Machine, such as browsing new pages, asking follow up questions, or enter entering search terms in a search box.

168.    The Meta Pixel was triggered each time Plaintiff and Class Members communicated with Perplexity via its AI Machine.  This resulted in Plaintiff's and Class Members' communications being intercepted, duplicated, and secretly transmitted to Meta at the same time the communications (in the form of HTTP GET requests and HTTP POST requests) were transmitted to Perplexity.

169.    In other words, as a result of the source code that Perplexity deployed on its website, *two* communications originate from a user's browser once the user initiates an action on Perplexity's website—one (as intended) sent to Perplexity and a second (undetectable to users like Plaintiff and Class Members) that was simultaneously sent to Meta. Accordingly, at the same time that Plaintiff's and Class Members' browsers sent communications to Perplexity, a duplicate of those communications was simultaneously sent to Meta as a result of the instructions that their browser's had previously received from Perplexity's website.

170.    Given that the two communications are literally generated and sent at the same time, the duplication is occurring while the intended communications are in transit.  Effectively, it is as if Perplexity planted a bugging device inside Plaintiff's and Class Members' telephones, so that when they placed a call, the bug simultaneously sent a radio signal to Meta in the next room, allowing Meta to listen in and record the call. In this way, Perplexity aided Meta to read, learn, and exploit the contents of Plaintiff's and Class Members' communications that they sent (and Perplexity received) within the state of California.

171.    For example, when a user searches for information about "pregnancy" using the AI Machine, data about the user's search, including the user's Conversational Dialogue and the user's Facebook ID, is surreptitiously forwarded to Facebook without the user's knowledge.

172.    Worse, the information that Perplexity's Meta Pixel sent to Meta was sent alongside Plaintiff's and Class Members' Facebook IDs (their "c_user cookie" or "FID") thereby allowing individual user's communications with Perplexity, and the private information contained in those communications, to be linked to their unique Facebook accounts.

173. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

174. The Meta Pixel allows companies like Perplexity to optimize the delivery of ads, measure cross-device conversions, create custom audiences and decrease advertising and marketing costs.

175. Third parties (such as Meta and Google) also use the information they receive to track user data and communications for marketing purposes.

176. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

177. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

178. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Meta.

179. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must include the third-party source code directly in their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

180.    More significantly, tracking pixels such as the Meta Pixel tool allow Defendants to secretly track, intercept, record, and transmit every communication made on Perplexity's website.  When users interacted with Perplexity's AI Machine, unbeknownst to them, the web page displayed on the user's browser included the Meta Pixel as embedded code, which is not visible to users.  This code is triggered when a visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends users' private information directly to Meta.

181.    Notably, this transmission only occurs on webpages that contain the Meta Pixel. Thus, Plaintiff's and Class Members' private information would not have been disclosed to Meta via the Meta Pixel but for Perplexity's decision to install the Meta Pixel inside its AI Machine.

182.    Similarly, Plaintiff's and Class Members' Conversational Dialogues and other private information would not have been disclosed to Meta via CAPI but for Perplexity's decision to install and implement that tool on its website and servers.

183.    By installing and implementing these tools, Perplexity caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Meta via the Pixel, and it caused a second improper disclosure of that information via CAPI.

**H.  Tracking pixels provide third parties with a trove of personally identifiable information.**

184.    The only reason for installing tracking pixels on a website is to share information about user communications with third parties like Meta and Google.  Indeed, that is the specific purpose for which tracking pixels are designed.  Perplexity purposely installed tracking pixels on its AI Machine to surreptitiously share users' communications with third parties like Meta and Google.

185.    Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

186.    For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses

of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Meta a unique and semi-persistent identifier across devices—one that has limited privacy controls.[24]

187.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

188.    Meta tracks every IP address ever associated with a Facebook user.

189.    Google also tracks IP addresses associated with Internet users.

190.    Meta, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

191.    Because of their uniquely identifying character, IP addresses are considered protected personally identifiable information.

192.    Likewise, internet cookies also provide personally identifiable information.

193.    In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

194.    Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

195.    Cookies are designed to operate as a means of identification for internet users. Advertising companies like Meta and Google have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire

---

[24] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

CASE NO. ——————————3:26-cv-02803   − 43 −

and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

196.    Cookies are considered personal identifiers.

197.    Tracking pixels can collect cookies from website visitors.

198.    In general, cookies are categorized by (1) duration and (2) party.

199.    There are two types of cookies classified by duration.

200.    "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

201.    "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

202.    Cookies are also classified by the party that uses the collected data.

203.    "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

204.    "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same user who visits Perplexity's website will also have cookies on their device from third parties, such as Meta and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

CASE NO. ———————————3:26-cv-02803    − 44 −

205.   Data companies like Meta have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits.  To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

206.   Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Defendants can deploy source code that uses Meta third-party cookies to help Meta acquire and record a user's communications, Defendants are not permitted direct access to Meta third-party cookie values. The reverse *was* also true:  Meta was not provided direct access to the values associated with first-party cookies set by companies like Defendants.  But Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Meta can gain access to first-party cookies.

207.   JavaScript source code developed by third party data companies and placed on a webpage by  developers such as Defendants can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company.  This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user.  Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

208.   In effect, cookie synching is a method through which Meta, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites, Meta and Google hack their way around any cookie blockers that users set up to stop their tracking.

CASE NO. ————————3:26-cv-02803   − 45 −

209. The Meta cookie used for cookie synching is named _fbp.

210. On information and belief, the letters fbp are an acronym for Meta Pixel.

211. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

212. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

213. The _fbp cookie is used as a unique identifier for users by Facebook.

214. If a user takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendants with Facebook users.

215. Perplexity engages in cookie synching with Meta, Google, and other third parties.

216. Perplexity's cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Perplexity assigns to users to also be made to third parties.

217. Perplexity caused the disclosure of users' cookie identifiers with each re-directed communication described herein.

218. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

219. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have

installed to generate a unique identifier which can then be used to match a user across websites."[25] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[26]   Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[27]

220.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[28]

221.    Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

222.    Perplexity used and caused the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including users' Conversational Dialogues with the AI Machine.

223.    A fourth kind of personally identifiable information is unique user identifiers (such as Meta's "Facebook ID") that permit companies like Meta to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered.  A Facebook ID is an identifying number string that is connected to a user's Facebook profile. Anyone with access to a user's Facebook ID can locate a user's Facebook profile.

224.    Unique identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

225.    Each of the individual data elements described above is personally identifiable on their own.  However, Perplexity's disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when

---

[25] https://www.blog.google/products/chrome/building-a-more-private-web/

[26] https://pixelprivacy.com/resources/browser-fingerprinting/

[27] https://www.blog.google/products/chrome/building-a-more-private-web/

[28] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

taken together, these data elements are even more accurate in identifying individual users, particularly when disclosed to data companies such as Meta, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

## I. Meta's Business Model: Exploiting Users' Personal Information for Profit

226.   Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

227.   Facebook describes itself as a "real identity" platform.[29] This means that users are permitted only one account and must share "the name they go by in everyday life."[30] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[31]

228.   In 2007, realizing the value of having direct access to millions of consumers, Meta began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[32] Meta has since evolved into one of the largest advertising companies in the world.[33] Meta can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[34] This allows Meta to make inferences about users based on their interests, behavior, and connections.[35]

229.   Today, Meta provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion

---

[29]     https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[30] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[31] https://www.facebook.com/help/406644739431633

[32] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[33] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[34] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[35] https://www.facebook.com/business/ads/ad-targeting

CASE NO. _____3:26-cv-02803   − 48 −

users.[36] Meta generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising.

230.    Meta maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Meta also tracks non-users across the web through its internet marketing products and source code.

231.    Meta offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

232.    Ad Targeting has been extremely successful due to Meta's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[37] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

---

[36] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

[37] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

233.    Perplexity used the Meta Pixel, Google Double Click, and Google Ads on its website (and Google Firebase and Google Analytics code within its Mobile Application) for marketing and increasing profits.

234.    In exchange for disclosing users' personally identifiable information, Perplexity received compensation from Meta and Google in the form of enhanced advertising services and more cost-efficient online marketing.

235.    Based on information and belief, Perplexity was advertising its services on Facebook, Instagram, and Google, and the Meta Pixel and the Google tracking technologies were used to help Perplexity learn which types of ads and platforms were getting the most engagement.

236.    By utilizing the Meta Pixel and Google Double Click, Google Ads, and Google Analytics, the cost of advertising was reduced, thereby benefitting and enriching Perplexity.

**J.    The Meta Pixel tool allows Meta to track the personal data of individuals across a broad range of third-party websites.**

237.    To power its advertising business, Meta uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

238.    One of Meta's most powerful tools is called the "Meta Pixel."

239.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[38] Once activated, the Meta Pixel "tracks the people and type of actions they take."[39] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[40] The Meta Pixel code works by sending Meta a detailed log of a user's interaction with a website such as clicking

[38] https://developers.facebook.com/docs/meta-pixel/

[39] https://www.facebook.com/business/goals/retargeting

[40] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

CASE NO. ——————————3:26-cv-02803    − 50 −

on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[41]

240.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Meta through a separate (but simultaneous) channel in a manner that is undetectable by the user.[42]  This information is disclosed to Meta regardless of whether a user is logged into their Facebook account at the time.

241.    The transmission is instantaneous—indeed Meta often receives the information before the health care provider does.

242.    The transmission is invisible.

243.    The transmission is made without any affirmative action taken by the user.

244.    The transmission occurs without any notice to the user that it is occurring.

245.    Meta collects users' communications and uses "cookies" to match these communications to Facebook users, allowing Facebook to target ads to a person who, for example, has used a hospital website and has exchanged communications about a specific condition, such as cancer.

246.    The information Meta Pixel captures and discloses to Meta includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[43]  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them.  Thus, the URL provides significant information regarding a user's

---

[41] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[42] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

[43] *In re Facebook*, 956 F.3d at 596.

browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

247.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Meta's own platform.  In this manner, Meta tracks users' browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[44]

248.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Meta also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All of this personally identifiable data is available each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Meta receives this information, Meta processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Meta can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

249.    These communications with Meta happen silently, without users' knowledge.  By default, the transmission of information to Meta's servers is invisible.  Meta's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[45]

250.    In exchange for installing its Meta Pixel, Meta provides website owners like Perplexity with analytics about the ads they have placed on Facebook and Instagram and tools to

---

[44] *In re Facebook*, 956 F.3d at 596.

[45] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

CASE NO. _____3:26-cv-02803    − 52 −

target people who have visited their websites.[46]  The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[47]

251.    Meta can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Meta.

252.    Meta touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[48]  According to Facebook, the Meta Pixel is an analytics tool that allows businesses to measure the effectiveness of their advertising by understanding the actions people take on their websites."[49]

253.    Meta warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[50]

254.    Meta recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[51]

255.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[52]  Meta builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Meta

[46]  https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[47] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[48] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[49] https://www.oviond.com/understanding-the-facebook-pixel

[50] https://developers.facebook.com/docs/meta-pixel/get-started

[51] https://developers.facebook.com/docs/meta-pixel/get-started

[52] https://developers.facebook.com/docs/meta-pixel/

CASE NO. _____3:26-cv-02803    − 53 −

associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

256. Meta tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[53]

257. For Meta, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data.

258. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[54] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[55] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[56]

259. Meta Pixel takes the information it harvests and sends it to Meta with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Meta stores this information on its servers, and, in some instances, maintains this information for years.[57]

260. Meta has a number of ways to exploit the data is being forwarded from third-party websites through the Meta Pixel.

---

[53] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

[54] https://developers.facebook.com/docs/meta-pixel/

[55] https://developers.facebook.com/docs/meta-pixel/

[56] https://developers.facebook.com/docs/meta-pixel/

[57] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

CASE NO. ———————————3:26-cv-02803  − 54 −

261.    If a user has a Facebook account, the user data may be collected and linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

262.    Alternatively, Meta can link the data to a user's Facebook account through the "Facebook Cookie."[58]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[59]

263.    Meta can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching."  There are two forms of Advanced Matching: manual matching and automatic matching.[60]  Manual matching requires the website developer to manually send data to Meta so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

264.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Meta—that hashing does not prevent *Meta* from using the data.[61]  In fact, Meta explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[62]

265.    Meta also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party

---

[58] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[59] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

[60] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[61] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[62] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

266. Meta also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

267. The data supplied by the c_user cookie allows Meta to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

268. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[63] The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendants' use of the Facebook Tracking Pixel program. The fbp cookie emanates from Defendants' Web Properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Meta to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[64]

---

[63] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[64] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

269. Meta also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Meta recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Meta can identify individual users, watch as they browse third-party websites like www.wexnermedical.osu.edu, and target users with advertising based on their web activity.

270. Meta then sells advertising space by highlighting its ability to target users. Meta can target users so effectively because it surveils user activity both on and off its official website. This allows Meta to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[65] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Meta utilizes precisely the type of Personal Health Information that Defendants bartered to Meta so that Meta can identify, target, and market products and services to individuals.

**K. Perplexity deployed the Meta Pixel and Google Double Click, and Google Ads inside its AI Machine, resulting in the capture and disclosure of users' sensitive communications to Meta and Google, including users' personal interests, queries, and habits.**

271. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

---

[65] https://www.facebook.com/business/ads/ad-targeting

CASE NO. ~~3:26-cv-02803~~ − 57 −

272.   Meta's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Meta gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Meta aggregates this data against all websites.[66] Meta benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

273.   Meta provides websites using the Meta Pixel with the data it captures in the "Meta Pixel page" found in the Events Manager dashboard of their Meta business accounts, as well as tools and analytics to reach these individuals through future Facebook ads.[67] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[68] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

274.   Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[69] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[70]

275.   Perplexity intentionally deployed the Meta Pixel on its website and inside its AI Machine. When a user typed prompts into the AI Machine, the Meta Pixel shared the contents of users' communications with Meta.

---

[66] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[67] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[68] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[69] https://instapage.com/blog/meta-pixel

[70] https://instapage.com/blog/meta-pixel

276.     The acquisition and disclosure of these communications occurred contemporaneously with the transmission of these communications by users. Thus, without its users' consent, Perplexity effectively used the Meta Pixel source code to commandeer and "bug" or "tap" its users' computing devices, allowing Meta to listen in on and receive all their communications with Perplexity, including users' most private and sensitive data.

277.     All this data was disclosed to Meta simultaneously in real time as visitors transmitted their information, along with other data, such as the user's unique Facebook ID that is captured by the c_user cookie, which allows Meta to link this information to user's unique Facebook accounts. Perplexity also disclosed other personally identifiable information to Facebook, such as users' IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

278.     Perplexity also disclosed the same kind of information to Google via Google Ads and Google Double Click every time a user interacted with the AI Machine available via Perplexity's website.  Perplexity similarly disclosed the same kind of information to Google via Google Firebase and Google Analytics SDK code every time users interacted with Perplexity's Mobile Application.

279.     Meta's Meta Pixel collects and forwards this data to Meta, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Meta then correlates the URL with the users' Facebook user ID, time stamp, browser settings, and even the type of browser used.  In short, the URLs, by virtue of including the specific communications that a user exchanged with Perplexity, reveal a significant amount of personal data about a user.  The captured "Conversational Dialogues" and the resulting URLs divulge a users' personal interests, queries, and habits on third-party websites (including Perplexity's website) operating outside of Facebook's platform.

280.     The nature of the collected data is also important.  Perplexity's unauthorized disclosures result in Meta obtaining a comprehensive history of an individual user's

Conversational Dialogues with Perplexity's AI Machine, no matter how sensitive the data that the user shared with Perplexity. Meta is then able to correlate that history with the time of day and other user actions on Perplexity's website. This process results in Meta acquiring a vast repository of personal data about users—all without their knowledge or consent.

281. These disclosures to third parties other than Meta are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[71] Like Meta, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendants routinely disclose users' personal information to such Google services as Google Analytics, Google DoubleClick, and Google Ads.

282. Google cookies provide personally identifiable data about users who visit Perplexity's website to Google. Defendants transmit personally identifiable Google cookie data to Google.

283. Perplexity deployed Google Tracking Technologies inside its AI Machine, resulting in the disclosure of communications exchanged with users to be transmitted to Google. These transmissions occurred simultaneously with users' communications with Perplexity and included communications that Plaintiff and Class Members made about specific health conditions, financial interests, sexual preferences, mental health concerns, and other sensitive topics.

284. By compelling visitors to its website to disclose personally identifiable data and sensitive information to Meta and Google, Perplexity knowingly disclosed information that allowed Meta and Google to link users' sensitive information to their private identities and target them with advertising. (or do whatever else Meta may choose to do with this data, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[72] Perplexity intentionally shared its users' communications with Meta and

---

[71] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

[72] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

Google in order to gain access to the benefits of the Meta Pixel, Google DoubleClick, Google Ads, and Google Analytics.

285.    Perplexity knew that by embedding the Meta Pixel (a Meta advertising tool) in its AI Machine that it was permitting Meta to collect, use, and share Plaintiff's and Class Members' communications, including sensitive information and personally identifying data. Perplexity was also aware that such information would be shared with Meta simultaneously with users' interactions with its website.

286.    Perplexity was also aware that installing the Meta Pixel tool and the various Google Tracking Technologies would result in one or more unauthorized persons at Meta and Google viewing the communications of Perplexity's users.  Perplexity's decision to affirmatively communicate and share its users' communications with Meta, Google, and those companies' employees violates the numerous protections afforded by California and federal law.

287.    One or more persons at Meta and Google viewed Plaintiff's and Class Members' communications as a consequence of Perplexity's installation of the Meta Pixel and the Google Tracking Technologies on its AI Machine. After Plaintiff's and Class Members' communications had been intercepted and disclosed, individuals at Meta and processed, analyzed, and assimilated Plaintiff's and Class Members' information into data sets like "Core Audiences" and "Custom Audiences" for the purpose of targeting Plaintiff and Class Members with advertising.

288.    Health, income, and other related financial information are highly valuable demographic markers for advertising purposes.

289.    Meta and Google knew that they were receiving financial, health, and other sensitive personal information via the Tracking Technologies deployed on Perplexity's website, AI Machine, and Mobile Application, but they did not make a genuine effort to prevent it.  Meta and Google did not take steps to do so because they had an affirmative desire to intercept and exploit users' confidential communications between themselves and Perplexity's AI Machine.

290.    For example, Meta knew about the data transmissions from several sources.  First, Meta monitors and analyzes all data that comes to it, because data collection is at the core of its business.  Second, it is important for Meta to assist high-traffic websites that provide advertising revenue to Meta.  Accordingly, Meta employees account managers to help website owners and developers use the Meta Pixel and other tools like Conversions API.  Perplexity and other popular AI Machines and conversational platforms provide substantial advertising revenue to Meta.  Meta therefore knew that Perplexity used the Meta Pixel and that using the Meta Pixel would result in confidential data being sent to Meta.

291.    Meta's alleged policy of prohibiting the disclosure of confidential or sensitive information to Meta is a sham because Meta does not take enforcement action against companies that it knows are sharing potentially sensitive information with it.  Rather, the primary purpose of Meta's alleged policy against the disclosure of confidential or sensitive information is to provide plausible deniability when Meta is sued for privacy violations.

292.    Meta's actions were taken for the purpose of violating the laws prohibiting the review and use of sensitive financial, health, and related information.  Meta's intent to unlawfully utilize the intercepted communications was separate and independent from its intent to violate CIPA and the Federal Wiretap Act.

293.    Likewise, Google also knew about the data transmissions from several sources. First, Google monitors and analyzes all data that comes to it, because data collection is at the core of its business.  Second, Google routinely reviewed the data that it received from Perplexity via the Google Tracking Technologies, then made aggregated reports regarding the raw data it had received available to Perplexity.  Google also monitors the high-traffic websites like Perplexity that provide advertising revenue to Google.  Finally, Google actively took the user data that it received from Perplexity, associated with user profiles, and used that data to sell advertising.

294.    Like Meta, Google's alleged policy of prohibiting the disclosure of confidential or sensitive information to Meta is a sham because Google does not take enforcement action against

companies that it knows are sharing potentially sensitive information with it. Rather, the primary purpose of Google's alleged policies against the disclosure of confidential or sensitive information is to provide plausible deniability when Google is sued for privacy violations.

295.    Moreover, given that both Google and Meta knew how their Tracking Technologies worked, knew that Perplexity offered an AI conversation to the public, and knew that their Tracking Technologies were sending data from Perplexity's AI Machine, it is implausible that Meta and Google were not willingly and willfully participating in the interception and disclosure of users' Conversational Dialogues with Perplexity.

296.    Meta and Google took no steps to filter or prevent the sensitive information they were receiving from the Tracking Technologies on Perplexity's website, AI Machine, and Mobile Application.

297.    Meta and Google did nothing to stop Perplexity from sending them its users' Conversational Dialogues because Meta and Google had financial and business incentives to continue receiving users' intercepted communications.

298.    Nor did Meta and Google ever expressly disclose to the public that they were intercepting, disclosing, and exploiting the Conversational Dialogues that they received from AI conversation platforms like Perplexity's AI Machine.

299.    Perplexity knew that installing the Meta Pixel and the various Google Tracking Technologies on its AI Machine would result in users' communications being improperly accessed by Meta and Google and their employees so that these companies could sell advertising. Perplexity made the decision to barter its users' communications to Meta and Google because it wanted access to the Meta Pixel and the various Google analytics and advertising tools. While that bargain may have benefited Defendants, it also betrayed the privacy rights of Plaintiff and Class Members.

**L. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

300.   Plaintiff and Class Members had no idea when they interacted with Perplexity's AI Machine their personal data, including the full transcripts of their Conversational Dialogues, was being collected and simultaneously transmitted to Meta and Google.  That is because, among other things, the Meta Pixel, Google DoubleClick, and Google Ads are seamlessly and secretly integrated into Perplexity's AI Machine and is invisible to users.

301.   For example, when Plaintiff and Class Members visited Perplexity's website, there was no indication that the Meta Pixel was embedded on its website or that it would collect and transmit their sensitive communications to Meta for advertising purposes.

302.   Upon opening Perplexity's AI Machine, users are not presented with Perplexity's Terms and Conditions or Privacy Policy (collectively, the "Agreements"), nor are they required to consent to them before using Perplexity's AI Machine.  In fact, it is *literally impossible* for a user to locate or navigate to the Agreements starting from the landing page of Perplexity's website.  There are no links to the Agreements anywhere on the landing page, nor does Perplexity offer users the ability to run a search for content on its website should they wish to locate the Agreements.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIALCORRECTED ORIGINAL CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



**Perplexity.ai landing page ("Search" link in top-left refers to running a query in Perplexity's AI Machine and does not allow users to search Perplexity's website)**

303.    Indeed, if first-time visitors wished to locate and review copies of the Agreements before starting to use Perplexity's AI Machine, therefore, they would be required to proactively and specifically search for them via a third-party search engine such as Google.

304.    As shown above, Perplexity *never* requires users to assent to the Agreements before creating an account with Perplexity or using its AI Machine in any capacity (whether with or without an account).   Instead, when an individual accesses Perplexity's homepage at www.perplexity.ai, they are simply presented with the prompt box for Perplexity's AI Machine and nudged to "Ask anything…"  A user can then immediately begin querying Perplexity's AI Machine about any of the suggested topics (listed in gray beneath the prompt box—for example, "Redesign my schedule around my priorities") or anything else that may be on their mind.

305.    A Guest User can simply begin conversing with Perplexity's AI Machine— without ever being aware that Perplexity even has a Privacy Policy or any Terms and Conditions.

306.    Nor are users required to assent to the Agreements when creating an account with Perplexity.  When an unregistered user accesses Perplexity's homepage, they are presented with three registration options:  "Continue with Google," "Continue with Apple," and "Continue with email."

307.    For example, when creating an account using their Apple ID, users are never at any point notified that Perplexity has Agreements purportedly governing the use of its AI Machine:



**Apple Account**                                                                                      Sign in



Use your Apple Account to sign in to Perplexity.

Email or Phone Number



In setting up Sign in with Apple, information about your interactions with Apple and this device may be used by Apple to help prevent fraud. See how your data is managed...

Continue           Sign in with iPhone

Requires a device with iOS 17 or later.

**Apple ID Account Creation for Perplexity**

308.    Likewise, users are also presented with the option to sign up for a Perplexity account by entering their email address:



309.    Users who sign up for an account via their email address ("Email Account Users") are sent a sign in link to their email account:



310.    Email Account Users are then sent a "Sign In" code to their email accounts:



311.    After entering the one-time code, new Email Account Users are taken to a screen inviting them to use Perplexity's AI Machine:

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIALCORRECTED ORIGINAL CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



312.    After hitting "Continue," new Email Account Users are taken to Perplexity's AI Machine and invited to begin conversing with Perplexity:



**Perplexity AI Machine "Welcome" Screen for Email Account Users**

313.    At no time during this process are new Email Account Users ever informed that Perplexity has a Privacy Policy or Terms and Conditions.  Much less are Email Account Users required to accept *anything* as a condition of using Perplexity's AI Machine.

314.    After Email Account Users create an account, Perplexity assigns them a unique identifier and remembers every time that users return to its website:

315.    Nor are things substantively different for Perplexity users who create accounts by associating their Perplexity account with their Google account ("Google Account Users").

316.    While new Google Account Users are presented with a note stating that they "can" review Perplexity's Agreements (in the case of registration via Google ID), Perplexity does not require "Google Account Users" to affirmatively "click," check a box, or otherwise agree to anything:



**Account creation workflow using a Google ID**

317.    Much less does Perplexity tell Google Account Users that their entire "Conversational Dialogues" will be shared with Meta and Google for the purpose of selling targeted advertising.

318.    New users who sign up via their Google accounts are asked to enter their Google password:

319.    Users who sign in using their Google account passwords are told that *Google* will share users' name, profile picture, and email address with *Perplexity*.

320.    New Google Account Users, however, *are not* told that *Perplexity* will be sharing their entire "Conversational Dialogues" with Meta and Google for the purpose of selling targeted advertising.  Nor are new Google Account Users told that Meta and Google will also share their interests, hobbies, likes, health information, sexual preferences, financial status, and other sensitive information with additional data brokers who will endlessly sell and resell their personal information.

CASE NO. ——————————3:26-cv-02803    − 72 −

321.    After new Google Account Users click on the "Continue" button, they are taken to Perplexity's AI Machine.  At no time, are new Google Account Holders ever required to affirmatively accept Perplexity's Privacy Policy or its Terms and Conditions.  Much less are new Google Account Users ever expressly informed that Perplexity will be sharing the full transcripts of their Conversational Dialogues with Meta and Google:





**Perplexity AI Machine "Welcome" Screen for Google Account Users**

322.    A user's reasonable expectation that their Conversational Dialogues will not be shared with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers.[73]

---

[73] Perplexity AI also offers paid "Perplexity Pro" and "Perplexity Max" Subscription agreements.  Those agreements are subject to a different of terms and conditions and are not at issue in this case.  Plaintiff does not have a paid

323.   Accordingly, Perplexity lacked authorization to intercept, collect, and disclose Plaintiff's and Class Members' communications to Meta and Google or aid in the same.

**M. Plaintiff and Class Members have a reasonable expectation of privacy in their Conversational Dialogues with Perplexity, especially with respect to sensitive information such as health and financial data.**

324.   Plaintiff and Class Members have a reasonable expectation of privacy in their communications with Perplexity's AI Machine, including personally identifying data and sensitive information. Perplexity's surreptitious interception, collection, and disclosure of its users' communications to Facebook and Google violated Plaintiff's and Class Members' privacy interests.

325.   Plaintiff's and Class Members' reasonable expectations of privacy in their communications are grounded in, among other things, Perplexity's common-law obligation to maintain the confidentiality of users' sensitive information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Perplexity's express and implied promises of confidentiality.

326.   Given the application of these laws to Defendants, Plaintiff and Class Members had a reasonable expectation of privacy in their communications.

327.   Indeed, several studies examining the collection and disclosure of consumers' sensitive information confirm that the disclosure of sensitive information violates expectations of privacy that have been established as general social norms.

328.   Polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

---

Perplexity Pro or a paid Perplexity Max Subscription agreement with Perplexity, and Plaintiff is not seeking to represent or bring claims on behalf of Perplexity Pro or Perplexity Max Subscribers.

329.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[74]

330.    Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[75]

331.    The concern about sharing personal information is compounded by the reality that advertisers view this type of information as particularly valuable. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Meta] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[76]

332.    Many privacy law experts have expressed serious concerns about consumers' sensitive information being disclosed to companies like Meta and Google.  As those experts have pointed out, having an individual's sensitive information disseminated in ways the individual is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

[74] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[75] https://www.wired.co.uk/article/apple-ios14-facebook

[76] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

**N. Plaintiff's and Class Members' personal information that Defendants collected, disclosed, and used has economic value, and its disclosure has caused Plaintiff and Class Members harm.**

333.   Plaintiff's personal information that Perplexity, Meta, and Google collected, monitored, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.

334.   It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendants have collected and disclosed from Plaintiff and Class Members.

335.   For example, Meta does not offer its Meta Pixel to companies like Perplexity solely for Perplexity's benefit.  "Data is the new oil of the digital economy," and Meta has built its business on harvesting and refining that "digital oil."[77]  For just this reason, the significant volumes of users' personal information that Perplexity provided to Meta is actively reviewed, analyzed, examined, curated, and exploited by Meta.  Meta acquires this data to transform it into a monetizable commodity, just like an oil company acquires crude oil for the purpose of transforming it into gasoline.  While Meta offers its Meta Pixel free of charge to companies like Perplexity, the "price" that these companies pay for using the pixel is the user data that they provide to Meta.

336.   Data harvesting is the fastest growing industry in the nation. As software, data mining, and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

337.   In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[78]

---

[77]https://www.wired.com/insights/2014/07/data-new-oil-digital-economy/#:~:text=Data%20in%20the%2021st%20Century,is%20more%20valuable%20than%20ever.

[78] https://ig.ft.com/how-much-is-your-personal-data-worth/

338.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[79] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[80]

339.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[81] This price is only increasing. According to Meta's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[82]

340.    In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

341.    Further, individuals can sell or monetize their own data if they so choose. For example, Meta has offered to pay individuals for their voice recordings,[83] and has paid teenagers and adults up to $20 per month plus referral fees to install an app that allows Meta to collect data on how individuals use their smart phones.[84]

342.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[85]

---

[79] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[80] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[81] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[82] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[83] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-proun11ciations-app

[84] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[85] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

CASE NO. ―――――――――3:26-cv-02803    ‒ 77 ‒

343.   Perplexity's unauthorized disclosure harmed Plaintiff and Class Members, robbing them of the value of their personal information.  Conservative estimates suggest that in 2018, internet marketing companies like Meta and Google earned $202 per American user from mining and selling their data.  More recent estimates are as high as $434 per user.

344.   Given the monetary value that data companies like Meta have already paid for personal information in the past, Perplexity has deprived Plaintiff and the Class Members of the economic value of their personal information by collecting, using, and disclosing that information to Meta and Google without consideration for Plaintiff's and Class Members' property.

**O.  Perplexity was enriched by making unlawful, unauthorized, and unnecessary disclosures of Plaintiff's and Class Members' personal information.**

345.   In exchange for disclosing its users' communications, Perplexity was compensated by Meta and Google with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

346.   For example, retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Companies using the Meta Pixel can take advantage of retargeting to display ads to "target audiences" composed of visitors to their websites.

347.   Once an individual's data is disclosed and shared with a third-party marketing company, however, the advertiser is also able to show ads to the user elsewhere on the internet.

348.   Retargeting allows third party advertisers to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a user or their activities on a website.  Using the Meta Pixel, a company could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

349.   The monetization of the data being disclosed by Defendants, both by Defendants and Meta, demonstrates the inherent value of the information being collected.  Worse, once personally identifiable information relating to a user's communications is disclosed to third parties

like Meta, Defendants lose the ability to control how that information is subsequently disseminated and exploited.

350.    For example, the user data that is sent to Meta and Google via their tracking pixel technologies is routinely shared with third-party data brokers.

351.    A data broker is a company that collects and sells personal information about individuals to other businesses.  Data brokers gather consumers' personal information from a variety of sources, and then compile comprehensive profiles they sell for purposes such as targeted advertising, risk assessment, and background checks.  Data brokers mass collection and sale of personal information raise significant consumer privacy concerns.  The personal data that data brokers collect and sell can be used to harm individuals, for example, by influencing insurance rates, loan denials, and unwanted advertising.

352.    Google has a history of sharing the data it receives via analytics technologies with data brokers.  For example, when advertisers use Google's real-time bidding system (RTB), RTB lets hundreds of companies bid for ad space on individual consumers based on their Google profile, which can include information such as age, sex, and interests.  While only one company will win the auction, hundreds of participating companies receive sensitive information about the potential recipient of the ad—device identifiers and cookies, web browsing and location data, IP addresses, and unique demographic information such as age and gender.  Worse, many companies participating in the RTB system are not there to fill ad spaces but instead use RTB to collect users' personal data.  Likewise, for users using cell phones or other Android devices that run on a Google operating system, every time they open an app on their Android phone or tablet, Google will timestamp it, and every ad the user is shown will be recorded and associated with their device profile.

353.    Meta is no better.  Meta has historically collaborated with data brokers to gather consumer data and enhance its user profiles for targeting advertising.  Meta itself acts as a first-party data broker, collecting data from user activities on its platform to offer targeted advertising,

which is its primary revenue source. Meta's data ecosystem extends through external partnerships, allowing Meta to collect data from user interactions on other websites and apps. Companies that pay for ads on Meta can then direct users to their websites, which embed trackers that collect information such as IP addresses and device IDs from visitors.

354. Meta also has a history of sharing its customers data with third parties, including most infamously Cambridge Analytica, who gained access to the data of tens of millions of Facebook users. Meta has also shared its customers data with "partners," such as Acxiom, Oracle, Epsilon, and Experian. Once this data is shared, neither Meta or its users have control over this data as it is endlessly sold and resold to data brokers around the world.

355. As a consequence of Perplexity's unauthorized disclosure of users' personal information to Meta and Google, Plaintiff and Class Members have further been harmed by their loss of control over their own personal information, which has now been shared with numerous data brokers participating in the online data market.

356. The only remedy for individuals whose personal information has been shared with Google and Meta is to use services such as DeleteMe and CyEx Privacy Shield Pro that go out into the online market place and "delete" users' personal data from data broker rolls. These services, however, cost anywhere from $100 to $300 a year on average for consumers to try and regain control over their personal information.

**P. Meta's history of egregious privacy violations.**

357. Perplexity knew or should have known that Meta could not be trusted with its users' personal information.

358. Due to its ability to target individuals based on granular data, Meta's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Meta entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory

manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Meta.

359.   In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

360.   In 2011, Meta settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[86]

361.   Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.

362.   In 2018, Meta was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytica may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Meta's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

---

[86] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

363. Likewise, a different 2018 report revealed that Meta had violated users' privacy by granting access to user information to over 150 companies.[87] Some companies were even able to read users' private messages.

364. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Meta revealed that it still enabled third-party developers to access this data.[88] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

365. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Meta's data collection practices, including the collection of health data. The report noted that while Meta maintained a policy that instructed developers not to transmit sensitive medical information, Meta received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[89]

366. The New York State Department of Financial Service's concern about Meta's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Meta's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Meta.[90] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Meta, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Meta, as well as with a

[87] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

[88] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

[89] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf

[90] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[91]

367.    More recently, Meta employees admitted to lax protections for sensitive user data. Meta engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[92]

368.    Despite knowing that the Meta Pixel code embedded in its AI Machine was sending users' Conversational Dialogues to Meta, Perplexity did nothing to protect users from egregious intrusions into their privacy, choosing instead to benefit at those users' expense.

**Q.  Perplexity's failure to inform its users that their personal information has been disclosed to Meta and Google or to take any steps to halt the continued disclosure of users' information is malicious, oppressive, and in reckless disregard of Plaintiff's and Class Members' rights.**

369.    Companies like Perplexity have a legal obligation to disclose data breaches to their customers.

370.    Perplexity's decision to hide its use of the Meta Pixel tool, Google DoubleClick, Google Ads, and Google Analytics from its users and its refusal to remove such technologies from its AI Machine after learning that users' communications were being routinely collected, transmitted, and exploited by Meta and Google is malicious, oppressive, and in reckless disregard of Plaintiff's and Class Members' rights.  Perplexity's conduct in intentionally concealing its use of Meta and Google tracking technologies from users was knowing, willful, and malicious. Perplexity was aware that installing the Meta Pixel and the various Google Tracking Technologies would result in the unauthorized disclosure of users' communications to Meta and Google.

---

[91] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[92] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

CASE NO. ———————————3:26-cv-02803    − 83 −

Perplexity nevertheless chose to install the Meta Pixel and Google Analytics inside its AI Machine, while leading their users to believe that their privacy rights would be respected.

**R. Tolling, Concealment, and Estoppel**

371. The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

372. Defendants seamlessly and secretively incorporated Meta Pixel, Google DoubleClick, Google Ads, Google Analytics, and other trackers into Perplexity's AI Machine, providing no indication to users that their Conversational Dialogues were routinely been shared with third parties for commercial exploitation.

373. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing the Meta Pixel, Google DoubleClick, Google Ads, and other third-party tracking technologies. Much less could Plaintiff and Class Members have discovered that Perplexity's "Incognito Mode" was a sham whereby Perplexity shared users' conversations with Meta and Google even when users were conducting those conversations in "Incognito Mode."

374. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of personal communications has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

## IV. CLASS DEFINITION

375. Defendants' conduct violates the law.

376. Defendants' unlawful conduct has injured Plaintiff and Class Members.

377. Defendants' conduct is ongoing.

378.    Plaintiff brings this action individually and as a class action against Defendants.

379.    Plaintiff brings this action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure individually and on behalf of the following proposed Class and Subclass:

> **The Nationwide Class:** For the period December 7, 2022 through February 4, 2026, all individuals in the United States (other than individuals with Perplexity Pro or Perplexity Max Subscription agreements) whose Conversational Dialogues with Perplexity's AI Machine were obtained by Meta and/or Google.

> **The California Subclass:** For the period December 7, 2022 through February 4, 2026, all California citizens (other than individuals with Perplexity Pro or Perplexity Max Subscription agreements) whose Conversational Dialogues with Perplexity's AI Machine were obtained by Meta and/or Google.

380.    Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action or appellate judge assigned to this case and any members of their staff and immediate families; (2) any jurors assigned to hear this case as well as their immediate families; (3) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendants' counsel.

381.    Plaintiff and Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance requirements for suing as representative parties.

382.    **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. The exact number of Class Members can be determined by review of information maintained by Defendants. The proposed class is defined objectively in terms of ascertainable criteria, such that the Court may determine the constituency of the class for the purposes of the conclusiveness of any judgment that may be rendered.

383.    **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect

individual Class Members. Common questions for the Class include, but are not limited to, the following:

(a)　Whether Defendants violated Plaintiff's and Class Members' privacy rights;

(b)　Whether Defendants' acts and practices violated California's Constitution, Art. 1, § 1;

(c)　Whether Defendants' acts and practices violated the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq.*;

(d)　Whether Defendants' acts and practices violated the California Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502;

(e)　Whether Defendants' acts and practices violated California's Online Privacy Protection Act, CAL. BUS. & PROF. CODE §§ 22575, *et seq*;

(f)　Whether Defendants' acts and practices violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq*;

(g)　Whether Defendants' acts and practices violated CAL. CIVIL CODE §§ 1798.81.5, § 1798.81.5;

(h)　Whether Defendants' acts and practices violated CAL. CIVIL CODE § 1798.83;

(i)　Whether Defendants' acts and practices violated CAL. CIVIL CODE §§ 1709 & 1710;

(j)　Whether Defendants were unjustly enriched;

(k)　Whether Defendants' acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.*;

(l)    Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

(m)    Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

384.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and the members of the Class arise from the same conduct by Defendants and are based on the same legal theories.

385.    **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is in conflict with the interests of the Class, and Defendants have no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

386.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

387.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible

standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

388.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would otherwise gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

389.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

390.    **Ascertainability and Notice:** Membership in the Class and Subclass can be determined by objective records maintained by Defendants, and adequate notice can be given to Class Members directly using information maintained in Defendants' records.

391.    **Class-Wide Injunctive Relief:** Unless a Class-wide injunction is issued, Defendants may continue to fail to properly secure the private information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendants may continue to act unlawfully as set forth in this Complaint as Defendants have acted or refused to act on grounds generally applicable to the Class.

Accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

392. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

- Whether Defendants owe a legal duty not to disclose Plaintiff's and Class Members' Conversational Dialogues with Perplexity's AI Machine;

- Whether Defendants breached a legal duty to Plaintiff and the Class Members to exercise due care in collecting, storing, using, and safeguarding their Conversational Dialogues with Perplexity's AI Machine;

- Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to the security of users' Conversational Dialogues with Perplexity's AI Machine;

- Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Conversational Dialogues with Perplexity's AI Machine would be disclosed to third parties; and

- Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

393. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## V. CLAIMS FOR RELIEF

**COUNT I—VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 630 ET SEQ.**
**Against Perplexity**
**(On Behalf of Plaintiff, the Class, and the Subclass)**

394. Plaintiff re-alleges and incorporates all preceding paragraphs.

395.    Plaintiff brings this claim on behalf of himself and all members of the Class and Subclass.

396.    The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

397.    To establish liability under section 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following things:

(1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system";

(2) "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable";

(3) "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is … being sent from, or received at any place within this state;"

(4) "who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or"

CASE NO. ————————3:26-cv-02803    − 90 −

(5) "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section…."

398.    CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

399.    The Meta Pixel, Google DoubleClick, Google Ads, Google Analytics and Google Firebase Code, Conversions API, and related backend and frontend software code that Perplexity deployed on its website, AI Machine, and Mobile Application are "machine[s], instrument[s], contrivance[s], or … other manner[s]" that Perplexity used to engage in the prohibited conduct at issue in this case.

400.    All alleged communications between Plaintiff, Class Members, and Perplexity qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

401.    Perplexity used a recording device to record the confidential communications without the consent of Plaintiff or Class Members and then transmitted such information to others, such as Meta and Google.

402.    At all relevant times, Perplexity's aiding of Meta, Google, and other third parties to learn the contents of its users' communications was without authorization and consent.

403.    At all relevant times, Perplexity used the intercepted communications that had been shared with Meta and Google by exploiting the analytics data that Meta and Google made available to Perplexity after Meta and Google analyzed and reviewed the intercepted communications.  This included using the analytics data that Meta and Google sent back to

Perplexity to enhance Perplexity's marketing schemes, to improve the operation of its website, and to train its AI technologies.

404.    The Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Perplexity. Perplexity expressly promised users that "We do not 'sell' or 'share' … personal information."  Perplexity never informed its users that their entire Conversational Dialogues with its AI Machine would be shared with Meta and Google for the purpose of commercially exploiting that information.  Nor did Perplexity ever inform its users that its "Incognito" mode was a sham or that interacting with Perplexity's AI Machine in Incognito mode would not protect users from having the contents of their communications shared with Meta and Google. Perplexity never received express consent from its users to share their Conversational Dialogues with Meta and Google.  Nor could Perplexity have received consent from Plaintiff and Class Members because Perplexity never sought to, or did, obtain Plaintiff's and Class Members' consent to transmit their Conversational Dialogues to Meta and Google.

405.    Perplexity engaged in and continues to engage in prohibited conduct by aiding others (including Meta and Google) to secretly intercept, read, learn, and use the contents of Plaintiff's communications.

406.    The intercepting devices used in this case include, but are not limited to:

(a)    Plaintiff's and Class Members' personal computing devices;

(b)    Plaintiff's and Class Members' web browsers;

(c)    Plaintiff's and Class Members' mobile devices;

(d)    Plaintiff's and Class Members' browser-managed files;

(e)    The Meta Pixel;

(f)    Google DoubleClick, Google Ads, Google Firebase code, and Google Analytics;

(g)    Internet cookies;

(h)     Defendants' computer servers;

(i)     Third-party source code utilized by Defendants; and

(j)     Computer servers of third parties (including Meta and Google) to which Plaintiff's Class Members' communications were disclosed.

407.    Perplexity aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Perplexity that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

408.    Perplexity aided in the interception of "contents" in at least the following forms:

(a)     The parties to the communications;

(b)     The precise text of users' Conversational Dialogues;

(c)     Personally identifying information such as users' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

(d)     The precise text of specific buttons on Perplexity's website(s) that users click to exchange communications, including Log-Ins, Registrations, Search, and other buttons;

(e)     The precise dates and times when users' accessed Perplexity's AI Machine;

(f)     Information that is a general summary or informs third parties of the general subject of communications that Perplexity sent back to users in response to search queries and requests for information;

(g)     Any other content that Perplexity has aided third parties in scraping from webpages or communications with its AI Machine and Mobile Application.

409.    Plaintiff and Class Members reasonably expected that their personal information and the contents of their Conversational Dialogues were not being intercepted, recorded, and disclosed to Meta, Google, and other third parties.

410.    No legitimate purpose was served by Perplexity's willful and intentional disclosure of Plaintiff's and Class Members' personal information to Meta, Google, and other third parties. Neither Plaintiff nor Class Members consented to the disclosure of their Conversational Dialogues to Meta, Google, and other third parties. Nor could they have consented, given that Perplexity, for example, never sought Plaintiff's or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to Meta via the Meta Pixel tool.

411.    The tracking pixels that Perplexity utilized are designed such that they transmitted each of a website user's actions to third parties alongside and contemporaneously with the user initiating the communication.  Thus, Plaintiff and the Class Members' communications were intercepted in transit to the intended recipient (Perplexity) before they reached Perplexity's servers in California.

412.    Perplexity willingly facilitated Meta's and Google's interception and collection of Plaintiff's and Class Members' Conversational Dialogues by deploying tracking Technologies on its website, AI Machine, and inside its Mobile Application.  Moreover, Perplexity had full control over these Tracking Technologies, including which webpages contained the tracking pixels, what information was tracked and shared, and how events were categorized prior to transmission.

413.    Perplexity gave substantial assistance to Meta and Google in violating the privacy rights of Perplexity's users, despite the fact Perplexity's conduct constituted a breach of the duties of confidentiality that it owed users.  Perplexity knew that the installation of the Meta Pixel and the Google Tracking Technologies on its website, AI Machine, and Mobile Application would result in the unauthorized disclosure of its users' communications to Meta and Google, yet

CASE NO. _____3:26-cv-02803    − 94 −

nevertheless did so anyway. Indeed, the only purpose of Tracking Technologies like the Meta Pixel and Google Analytics is to share information with third parties. Worse, Perplexity's decision to share its users' communications without authorization with Meta and Google violated multiple state and federal laws.

414. Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Conversational Dialogues and associated personal information, including using their personal information to develop marketing and advertising strategies. The private information that Perplexity assisted Meta, Google, and other third parties with reading, learning, and exploiting included Plaintiff's and Class Members' medical conditions, their political views, their sexual preferences, their financial prospects, and their mental health concerns.

415. Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

416. In addition to statutory damages, Defendants' breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Perplexity took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

(c)    Perplexity's unauthorized disclosures have resulted in multiple third-party data brokers obtaining Plaintiff and Class Members' personal information, which can only be remediated by the purchase of expensive data privacy

products such as DeleteMe and CyEx Privacy Shield, costing hundreds of dollars a year.

417.    Plaintiff and Class Members have also suffered irreparable injury from Defendants' unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendants without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for information using Perplexity's AI Machine and Mobile Application. Plaintiffs will continue to suffer harm if Perplexity's website, AI Machine, and Mobile Application are not redesigned. If these technologies were redesigned to comply with applicable laws, Plaintiff would use Perplexity's AI Machine to search for information in the future. Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

418.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT II—INVASION OF PRIVACY AND VIOLATION OF
THE CALIFORNIA CONSTITUTION, ART. 1, § 1
Against Perplexity
(On Behalf of Plaintiff, the Class, and the Subclass)**

419.    Plaintiff re-alleges and incorporates all preceding paragraphs.

420.    Plaintiff brings this claim on behalf of himself and all members of the Class, and the Subclass.

421.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

422.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of

privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

423. The right to privacy in California's constitution creates a right of action against private and government entities.

424. Plaintiff and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

425. Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Defendants included personal, sensitive information; and (ii) Plaintiff and Class Members did not consent or otherwise authorize Perplexity to disclose this information, including complete transcripts of their Conversational Dialogues, to others for their own monetary gain.

426. Plaintiff and Class Members had a reasonable expectation of privacy that their communications, identity, and sensitive information would remain confidential and that Perplexity would not install surreptitious wiretapping technology on its website, AI Machine, and Mobile Application to secretly transmit their communications to third parties, including Meta and Google.

427. Given the nature of the information that Perplexity disclosed to Meta, Google, and other third parties, such as users' email addresses, names, search terms, and the entire transcripts of their Conversational Dialogues—information that was shared even when users held conversations with the AI Machine in Incognito mode—this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

428. The disclosure of users' Conversational Dialogues and their personally identifiable information constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Class Members' rights to privacy.

429. Plaintiff and Class Members did not consent to, authorize, or know about Perplexity's disclosure of their communications to Meta, Google, and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their Conversational Dialogues with Perplexity's AI Machine information could be collected, used, and monetized by Meta and Google.

430. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for information using Perplexity's AI Machine. Plaintiff and Class Members will continue to suffer harm if the website, AI Machine, and Mobile Application are not redesigned. If these technologies were redesigned to comply with applicable laws, Plaintiff would use Perplexity's AI Machine to search for information in the future.

431. Plaintiff and Class Members therefore seek injunctive relief to prevent Defendants from continuing to collect, use, and sell Personal Health Information without consent.

432. Plaintiff and Class Members have been damaged as a direct and proximate result of Perplexity's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

433. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Perplexity as a result of its intrusions on Plaintiff's and Class Members' privacy.

434. Perplexity's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b) Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their information from data broker rolls;

CASE NO. ————————3:26-cv-02803 − 98 −

(c)    Perplexity took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d)    Plaintiff and Class Members did not get the full value of the services for which they paid, which included Perplexity's duty to maintain confidentiality; and

(e)    Perplexity's actions diminished the value of Plaintiff's and Class Members' personal information.

435.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Perplexity's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

436.    Plaintiff and Class Members seek attorney's fees in accordance with CAL. CIV. PROC. CODE § 1021.5 (West).

437.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III—VIOLATIONS OF CAL. CIVIL CODE §§ 1709 & 1710**
**Against Perplexity**
*(On behalf of ~~the Doe~~ Plaintiff, the Class, and the Subclass)*

438.    Plaintiff re-alleges and incorporates all preceding paragraphs.

439.    Plaintiff brings this claim on behalf of himself, the Class, and the Subclass.

440.    California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intend to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

441.    California Civil Code § 1710 defines "deceit" as (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts

which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

442.   Throughout the class period, Perplexity engaged in deceit by intentionally concealing and failing to disclose the true nature of its AI Machine and conduct to Perplexity's users.  For example, Perplexity provided Subscribed Users access to an "Incognito Mode" when conducting Conversational Dialogues with Perplexity's AI Machine, leading users to believe that their communications with Perplexity's AI Machine would remain private and would not be shared with third parties.  Perplexity knew that its representations regarding "Incognito Mode" were false and misleading to users because it was routinely sharing users' Conversational Dialogues with Meta and Google and that the facts Perplexity failed to disclose were material.

443.   Perplexity owed a duty to Plaintiff and Class Members to provide them material information about its routine disclosure of their Conversational Dialogues to Meta and Google, which Perplexity invited them to share through its AI Machine and Mobile Application. Perplexity's omissions and nondisclosures described herein were likely to deceive reasonable consumers, and have deceived Plaintiff and Class Members.

444.   Perplexity's omissions and nondisclosures were pervasive. Plaintiff and Class Members reasonably relied on the material omissions and nondisclosures by Perplexity.

445.   Perplexity's misconduct alleged herein was intentional, deliberate, and willful, and was perpetrated with the intent to, inter alia, cause Plaintiff and Class Members unknowingly to divulge their communications with the intent to induce them to alter their position to their injury or risk under Cal. Civ. Code § 1709.

446.   Plaintiff seeks recovery of his and the Class Members' resulting damages, including economic damages, restitution, and disgorgement, as well as punitive damages

## COUNT IV—QUASI-CONTRACT/RESTITUTION/UNJUST ENRICHMENT
### Against Perplexity
*(On Behalf of Plaintiff, the Class, and the Subclass)*

447.    Plaintiff re-alleges and incorporated by reference all paragraphs above as if fully set forth herein.

448.    Plaintiff brings this claim on behalf of himself and all members of the Class and Subclass.

449.    To the extent required by law, this count is alleged in the alternative to legal claims pursuant to F.R.C.P. 8.

450.    California law expressly recognizes that injured plaintiffs have a right to disgorgement of a defendant's profits in the absence of a cognizable economic loss.

451.    Perplexity wrongfully and unlawfully received, used, and/or sold Plaintiff's and Class Members' Conversational Dialogues and sensitive, personal information without their consent.  Perplexity benefited financially from doing so.

452.    Plaintiff and Class Members conferred a benefit on Perplexity in the form of valuable sensitive information that Perplexity collected from Plaintiff and Class Members under the guise of keeping this information private, and Perplexity appreciated this benefit.

453.    Perplexity gained access to the personal information and communications provided by Plaintiff and Class Members by (1) knowingly concealing its use of Tracking Technologies from the public; (2) failing to provide industry standard privacy safeguards for its users' communications; and (3) intentionally violating California law.

454.    Perplexity benefited from the use of Plaintiff's and Class Members' private communications and unjustly retained those benefits at their expense.

455.    Perplexity collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Meta and Google. Specifically, Perplexity bartered Plaintiff's and Class Members' Conversational Dialogues to Google, Meta, and other Third Parties in return for both advertising benefits and "free" website

CASE NO. _____3:26-cv-02803   − 101 −

analytics information. What is more, by sharing users' communications with Google and Meta, Perplexity gained the ability to utilize Google's and Meta's customized audiences and targeted advertising features, which saved Perplexity substantial revenues by making advertising far less expensive than it would have been otherwise. Perplexity also gained access to free website analytics data from Meta and Google, which it otherwise would have had to spend substantial amounts of money to provide for itself.

456. Plaintiff and Class Members would not have used Perplexity's services if they had known that Perplexity would collect, use, and disclose this information to Third Parties like Google.

457. Perplexity exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Perplexity with economic, intangible, and other benefits, including substantial monetary compensation, that it obtained through the illegal and unethical conduct described herein.

458. Companies like Meta and Google are not charities. Meta and Google were willing to provide Perplexity with "free" analytics benefits only because the information that Perplexity surreptitiously shared has an economic value many times in excess of the analytics services that Meta and Google provided to Perplexity.

459. Perplexity's decision to intentionally mislead Plaintiff and Class Members about its use of Tracking Technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

460. Perplexity unjustly retained those benefits at the expense of Plaintiff and Class Members because Perplexity's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

461. Plaintiff was aware of the economic value of his personal information and reasonably expected to be compensated by any party who shared or accessed their personal

information to sell advertising.  Plaintiff and Class Members did not consent to Perplexity giving their personal information and communications away for free.

462.    By engaging in the acts and failures to act described in this Complaint, Perplexity has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the personal information of the Plaintiff and the Class.

463.    Defendants were on notice that users' personal information was protected by law; that users' personal information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access users' personal information, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of users' Conversational Dialogues Meta, Google, and other Third Parties.

464.    The benefits that Perplexity derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.

465.    It would be inequitable under unjust enrichment principles for Perplexity to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

466.    The legal remedies available to Plaintiff and Class Members are inadequate because they are not as equally prompt and certain as equitable relief.  Damages are less certain than restitution because the standard that governs restitution is different than the standard that governs actual damages.  Hence, the Court may award restitution even if it determines that Plaintiff has failed to sufficiently adduce evidence in support of an award of damages.  Moreover, equitable relief, including restitution, entitles Plaintiff and Class Members to recover all profits from the wrongdoing.  In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

467.    Plaintiff and Class Members have suffered an injury in fact and have lost money and/or property as a result of Perplexity's unjust conduct.  Plaintiff and Class Members lack an

adequate remedy at law with respect to this claim and are entitled to disgorgement of the financial profits that Perplexity obtained as a result of its unjust conduct.

**COUNT V--NEGLIGENCE**
**Against Perplexity**
*(On Behalf of Plaintiff, the Class, and the Subclass)*

468.   Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

469.   Plaintiff brings this claim on behalf of himself and all members of the Class and the Subclass.

470.   By creating a website designed to elicit users to share sensitive information, and by accepting, storing, and controlling the Conversational Dialogues of Plaintiff and Class Members, Perplexity owed a duty to Plaintiff and Class Members to exercise reasonable care to secure, safeguard, and protect their sensitive information and Conversational Dialogues against unauthorized disclosures to third parties like Meta and Google.

471.   Perplexity breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff and Class Members' Conversational Dialogues from unauthorized disclosure.

472.   It was reasonably foreseeable that Perplexity's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Conversational Dialogues from disclosure via the Tracking Technologies would result in unauthorized Third Parties gaining access to these communications for no lawful purpose.  It was also foreseeable that unauthorized third parties like Meta and Google would use such intercepted communications to their benefit and to the detriment of Perplexity's users, with injuries including loss of privacy, the time and resources required to respond, and diminution in value of their personal information.

473.   Perplexity has much greater control and sophistication regarding data privacy than the users of its AI Machine. Perplexity was also aware that companies like Meta and Google

design their Tracking Technologies to make it impossible for internet users to "opt out" of routine data collection.

474.    Perplexity's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' communications arose due to the special relationship between Perplexity and its users, which is recognized by statute, regulations, industry ethical rules and the common law.

475.    In addition, Perplexity had a duty under state and federal privacy laws, which the state legislature and Congress enacted to protect the confidentiality of users' communications, set strict conditions under which companies may use such information, and limit to whom companies can disclose such information.

476.    Perplexity's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their personal information. Perplexity's misconduct included the failure to (i) secure Plaintiff and Class Members' communications; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of Tracking Technologies.

477.    Perplexity also had a duty to notify Plaintiff and Class Members within a reasonable time frame of any breach to the confidentiality and security of their Conversational Dialogues.  This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect the confidentiality of their Conversational Dialogue and to mitigate the harm caused by Perplexity's conveyance of their Conversational Dialogue to Google.

478.    Perplexity owed these duties to Plaintiff and the Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Perplexity knew or should have known would suffer injury-in-fact from Perplexity's deployment of Tracking Technologies on its AI Machine.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIALCORRECTED ORIGINAL CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

479.    The risk that Google and Meta would access, exploit, and misuse Plaintiff's and Class Members' Conversational Dialogues was foreseeable.  Given that Perplexity receives vast amounts of users' personal information, and that Google and Meta disclose what they do with the data they acquire, Perplexity was on notice of the need to protect Plaintiff's and Class Members' Conversational Dialogues from unauthorized disclosures via analytics technologies.

480.    Consumers' personal information is highly valuable, and Perplexity knew or should have known the risks in obtaining, storing, handling, transmitting, and using Plaintiff's and Class Members' Conversational Dialogues, and the importance of exercising reasonable care in the handling and protection of Plaintiff's and Class Members' Conversational Dialogues.

481.    Perplexity breached its duty of reasonable care to Plaintiff and Class Members in deploying Google Analytics on its AI Machine and by failing to supervise its employees, agents, contractors, and vendors in the acquisition, handling, and securing of the Plaintiff's and Class Members' Conversational Dialogues.  Perplexity further breached its duty of reasonable care to Plaintiff and Class Members by sharing their Conversational Dialogues with Google and Meta, which actually and proximately caused injuries to Plaintiff and the Class Members.

482.    Perplexity also breached its duty of care by failing to provide reasonable and timely notice to Plaintiff and the Class Members that their Conversational Dialogues had been shared with Google and Meta, which actually and proximately caused additional injuries to Plaintiff and the Class Members.

483.    As a direct and traceable result of Perplexity's negligence, Plaintiff and Class Members have suffered damages, including monetary damages, increased risk of future harm, loss of privacy, and fear, anxiety, and worry about their loss of control over their Conversational Dialogues.

484.    But for Perplexity's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured. These injuries were the reasonably foreseeable result of Defendant's breach of its duties. Perplexity knew or

should have know that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harm associated with the exposure of their personal information.

485.   A data broker is a company that collects personal information from various sources, including online activities, and sells it to other businesses.  These businesses then use this information for marketing, risk assessment, insurance pricing, and other purposes.  Data brokers often operate effectively anonymously because they do not have direct contact with consumers.  As a result, the vast majority of consumers are not even aware that their personal data is being sold and re-sold.

486.   As a consequence of Perplexity's negligence, Plaintiff and Class Members have been harmed by losing control over their own personal information, which has now been shared with Google, with Meta, with advertisers, and with online data brokers who buy, sell, and resell this information.  The only way for Plaintiff and Class Members to claw back the privacy of their information is to pay a data broker opt service to go out into the marketplace and remove their information from data broker rolls.  Such data broker opt out services are offered by a variety of companies including DeleteMe, CyEx, and Optery for prices that range from $100 to $300 a year.  Without hiring one of these data broker opt out services, however, Plaintiff and Class Members have no way of recovering their privacy because Perplexity itself has no control over their Conversational Dialogues once Perplexity shared that data with Google and Meta.

487.   Had Plaintiff and Class Members known that Perplexity would not adequately protect their communications, Plaintiff and Class Members would not have entrusted Defendant with their personal information.

488.   Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their PHI and were accordingly entitled to protection of this PHI against the acquisition and disclosure of their PHI by unreasonable means.

489.    Perplexity's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' communications constituted negligence at common law.

490.    As a proximate result of Perplexity's acts and omissions, Plaintiff's and Class Members' PHI was subject to intrusion, causing Plaintiff and Class Members to suffer injury, including, at minimum, the following damages:

   a.  General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

   b.  Plaintiff and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their data from data broker rolls;

   c.  Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

   d.  Perplexity took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

   e.  The harm being suffered by Plaintiff and Class Members is ongoing because—as of the time of the filing of this complaint—Perplexity continues to permit the deployment of the Meta Pixel on its AI Machine.

491.    Plaintiff and Class Members have no adequate remedy at law for the injuries that they have suffered (and will continue to suffer) because of Perplexity's wrongful practices in that a judgment for money damages will not end the invasion of privacy for Plaintiff and Class Members. Accordingly, Plaintiff and Class Members seek such injunctive relief as the Court deems legal, equitable, and proper.

**COUNT VI—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET. SEQ.***
**Against Perplexity**
**(On behalf of Plaintiff, the Class, and the Subclass)**

492.    Plaintiff re-alleges and incorporates all preceding paragraphs.

493.    Plaintiff brings this claim on behalf of himself, the Class, and the Subclass.

494.    Plaintiff, Class Members, and Perplexity are each a "person" under Cal. Bus. & Prof. Code § 17201.

495.    California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.

496.    Perplexity's business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. Seq.* (the "UCL") because, as alleged above, Perplexity violated California common law, the California Constitution, and other statutes and causes of action alleged herein.

497.    Perplexity engaged in unlawful acts and practices by imbedding Tracking Technologies on its website, AI Machine, and Mobile Application, which tracks, records, and transmits Plaintiff's Class Members communications that they disclose to Perplexity in confidence via the AI Machine to third parties without Plaintiff's and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502; and by representing that their services have characteristics, uses, or benefits that they do not have in violation of Civil Code § 1770.

498.    For example, inconsistent with its promise that users could conduct their conversations with its AI Machine in Incognito Mode, Perplexity disclosed Plaintiff's and Class Members' Conversational Dialogues to third parties without their consent and for marketing purposes. Thus, Defendants represented that their services have characteristics, uses, or benefits that they do not have and represented that its services are of a particular standard, quality, or grade when they were not, which violates California Civil Code Section 1770.

499.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Perplexity would take appropriate measures to keep their Conversational Dialogues secure and

not share them with third parties without their express consent.  Perplexity also had a duty to disclose that it was sharing its users' communications with third parties. However, Perplexity did not disclose at any time that it was sharing transcripts of its users' Conversational Dialogues with third parties via the Tracking Technologies and other third-party tracking software.

500.    Had Plaintiff and Class Members known that Perplexity would intercept, collect, and transmit their communications to Meta, Google, and other third parties, Plaintiff and Class Members would not have used Perplexity's services.

501.    Plaintiff and Class Members have a property interest in their Conversational Dialogues and personal information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' communications, Perplexity has taken property from Plaintiff and Class Members without providing just (or indeed *any*) compensation.

502.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications with Meta, Google, and other third parties, Perplexity has taken money and/or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class Members.

503.    Perplexity's business acts and practices also meet the unfairness prong of California's Unfair Competition Law ("UCL") according to all three theories of unfairness.

504.    First, Perplexity's business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiff and Class Members suffered substantial injury due to Perplexity's disclosure of their personal information; (b) Defendant's disclosure of Plaintiff's and Class Members' personal information provides no benefit to consumers, let alone any countervailing benefit that could justify Perplexity's disclosure of its users' Conversational Dialogues without consent for marketing purposes or other pecuniary gain; and (c) Plaintiff and Class Members could not have readily avoided this injury because they had no way of knowing that Perplexity was implementing the Tracking Technologies. Thus, Plaintiff and Class Members

did not know to ask Defendant to stop the practice of disclosing their Conversational Dialogues and did not know that they should stop using Perplexity's services to avoid disclosing their Conversational Dialogues.

505.     Second, Defendants' business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiff and Class Members, and "the utility of [Defendants'] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiff and Class Members. *Drum v. San Fernando Valley Bar Ass'n*, (2010) 182 Cal. App. 4th 247, 257. Perplexity secretly collected, disclosed, and otherwise misused Plaintiff's and Class Members' communications by bartering them to Meta and Google in return for access to analytics and marketing benefits. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

506.     Third, Perplexity's business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. This public policy is codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*.; and the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, among other statutes. Perplexity violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff's and Class Members' personal informaiton by sharing that information with Meta and other third parties without Plaintiff's and/or Class Members' consent.

507.     Had Plaintiff and Class Members known Defendant would intercept, collect, and transmit their personal information to Meta and Google, Plaintiff and Class Members would not have used Defendant's services.

508.    Plaintiffs and Class Members were reasonable to assume, and did assume, that Perplexity would take appropriate measures to keep their Conversational Dialogues secure and not share them with third parties without their express consent. Perplexity was in sole possession of and had a duty to disclose the material information that Plaintiff's and Class Members' personal information would be shared with third parties via the Tracking Technologies.  Perplexity did not disclose at any time that they were sharing this data with third parties via the Tracking Technologies and other third-party tracking software.

509.    Plaintiff and Class Members have a property interest in their personal information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' information, Perplexity has taken property from Plaintiff and Class Members without providing just (or indeed *any*) compensation.

510.    Plaintiff and Class Members have lost money and property due to Defendants' conduct in violation of the UCL. Personal information such as the data that Perplexity collected and transmitted to third parties has objective monetary value. Companies are willing to pay for consumers' personal information, like the information Defendant unlawfully collected and transmitted to third parties, such as Meta.

511.    When users choose to share data with businesses like Perplexity, they do so with the expectation that their data will be protected. If a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have. This constitutes an injury to money or property.  This logic applies with equal force to free services, because a user willing to provide certain information with expectations of security in exchange for a free service may not have been willing to do so without compensation if they realized what would actually happen to their information.

512.    Likewise, in challenging the unlawful disclosure of their sensitive information to Meta and Google, Plaintiff and Class Members effectively contend that they were deprived of their right to exclude Meta and Google from that intangible property.

513.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' personal information and communications with Meta, Google, and other third parties, Defendant has taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of themselves and the Class Members.

514.    Plaintiff and Class Members value the privacy of their Conversational Dialogues and sensitive information at more than a trifle. Perplexity's actions caused damage and loss to Plaintiff's and Class Members' right to control the dissemination and use of their personally identifiable communications. Plaintiff and Class Members also suffered economic injury by the loss of their Conversational Dialogues with no consent or disclosure.

515.    Plaintiff and the Class Members also face a real and immediate threat of future injury to the confidentiality of their personal information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Class Members interact with the AI Machine, Plaintiff and Class Members risk further disclosure of their personal information.

516.    As a direct and proximate result of Defendant's unfair and unlawful methods and practices of competition, Plaintiff and Class Members suffered actual damages, including, but not limited to, the loss of the value of their personal information.

517.    As a direct and proximate result of their unfair and unlawful business practices, Perplexity has been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, including disgorgement of all profits accruing to Perplexity because of its unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

**COUNT VII—VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) ET SEQ.**
**Against Meta and Google**

**(On behalf of Plaintiff, the Class, and the Subclass)**

518. Plaintiff re-alleges and incorporates all preceding paragraphs.

519. Plaintiff bring this claim on behalf of himself and the Nationwide Class.

520. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

521. The ECPA protects individuals against eavesdropping committed with an improper purpose.

522. Plaintiff's and Class Members' communications via the AI Machine are covered communications under the ECPA.

523. Meta and Google's intentional interception of Plaintiff's and Class Members' Conversational Dialogues were done contemporaneously with Plaintiff's and Class Members' sending and receipt of those communications.

524. The ECPA protects both the sending and receipt of electronic communications.

525. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

526. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio,

electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

527. The transmissions of data between Plaintiff and Class Members, on the one hand, and Perplexity, on the other, qualify as communications under the ECPA.

528. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

529. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

530. The "contents" of Plaintiff's and Class Members' electronic communications included at least:

   a.   the parties to the communications;

   b.   the precise text of their search queries;

   c.   personally identifiable information such as their IP addresses, Google IDs, browser fingerprints, and other unique identifiers;

   d.   the precise text of their Conversational Dialogues;

   e.   information that is a general summary or informs third parties of the general subject of communications that Perplexity sent back to them in response to requests for information;

   f.   the pages that users requested to view on Perplexity's website, including the full-string URLs associated with those pages;

   g.   any other content that Perplexity has aided Meta and Google in scraping or acquiring from Perplexity's website, AI Machine, and Mobile Application.

531. Plaintiff's and Class Members' communications using the AI Machine "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

CASE NO. ⸻3:26-cv-02803   − 115 −

a.      Plaintiff's and Class Members' personal computing devices;

b.      Plaintiff's and Class Members' web browsers;

c.      Plaintiff's and Class Members' browser-managed files;

d.      Plaintiff's and Class Members' mobile phone browsers;

e.      Google Analytics;

f.      Google DoubleClick;

g.      Google Ads;

h.      The Meta Pixel;

i.      Internet cookies;

j.      Perplexity's computer servers;

k.      Perplexity's Mobile Application;

l.      Third-party source code used by Perplexity;

m.      Third-party source code used by Meta and Google.

532.    Meta and Google violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511, by directly intercepting Plaintiff's and Class Members' electronic communications through its own Tracking Technologies, knowing those technologies would capture and transmit the communications.

533.    Meta and Google's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a.      Cookies, including Google and Meta cookies disguised as cookies belonging to Perplexity;

b.      Perplexity's web servers;

c.      Meta's web servers;

d.      Google's web servers;

e.      The Meta Pixel;

f.      Google Analytics;

g.    Google Firebase code;

h.    Google DoubleClick;

i.    Google Ads; and

j.    The other source code described herein.

534.    Whenever Plaintiff and Class Members interacted with the AI Machine, Meta and Google, through the Tracking Technologies deployed on Perplexity's website and AI Machine, intentionally intercepted and divulged the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, *i.e.*, Google and Meta.

535.    Without Plaintiff's and Class Members' knowledge or consent, Meta and Google acquired the content of Plaintiff's and Class Members' communications while they were still exchanging communications with Perplexity. Those communications were shared with Meta and Google in return for marketing and advertising benefits.

536.    Meta and Google used the personal information and Conversational Dialogues they received from the Tracking Technologies deployed on the AI Machine to sell targeted advertising to other third parties.  Among other things, Google and Meta used the communications they intercepted for the purpose of (1) re-selling and disclosing users' personal information to data brokers; (2) selling targeted advertising; (3) training their internal AI systems on the Conversational Dialogues they acquired from Perplexity; and (4) building sophisticated user profiles of Perplexity's customers that Meta and Google commercially exploited for their own purposes.  While that bargain may have enriched Google and Meta, it came at the expense of Plaintiff and Class Members.

537.    For example, when a user interacts with the AI Machine, a "TLS handshake" occurs that opens a line between the user's communications device and Perplexity's servers. The line remains open and communications continue to flow back and forth from the user's communications device and the servers. The user's communications with Perplexity flow through

this open line. Because a webpage load involves tens or even hundreds of requests between a user's browser and the website server to load individual pages, the interception and sharing of communications content with Meta and Google happens contemporaneously in real time with the page load while the communications between a user's browser and the website's server are in still transit.

538.    Meta and Google were not authorized parties to the communications between Perplexity and the AI Machine users because Plaintiff and Class Members were unaware that Meta and Google were intercepting their communications.

539.    Plaintiff and Class Members did not consent to Perplexity sharing their Conversational Dialogues with Meta and Google.  Nor did Plaintiff and Class Members consent to Meta and Google's interception, disclosure, and exploitation of their Conversational Dialogues.

540.    After intercepting Plaintiff and Class Members' communications, Meta and Google used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(a).

541.    The interception, disclosure, and exploitation Plaintiff's and Class Members' communications by Meta and Google were unlawful and tortious, and were done in furtherance of one more illegal acts including tortious invasion of privacy, violation of California's unfair competition law, and violation of California's Comprehensive Computer Data Access and Fraud Act.  Meta and Google each intercepted Plaintiff's and Class Members' communications for the illegitimate purpose of disclosing those communications to additional unauthorized parties and commercially exploiting those communications in a variety of ways.  This intended and intentional disclosure violated both federal and state laws as set out above.

542.    Meta and Google  would not have been able to obtain (much less exploit) Plaintiff's and Class Members' communications for advertising and marketing services if they

had complied with those laws.  Moreover, Meta and Google knew that their conduct was illegal under those laws.

543.    As a direct and proximate result of Defendants' violation of the ECPA, Plaintiff and Class Members were damaged by Defendants' conduct in, at minimum, the following ways:

    a.    Defendants harmed Plaintiff's and Class Members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is private no longer private;

    c.    Plaintiff and Class Members cannot remediate the privacy harms they have suffered without spending hundreds of dollars a year to pay for third-party services to scrub their personal information from data broker rolls;

    d.    Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit; and

    e.    Defendants' actions diminished the value of Plaintiff and Class Members' personal information.

544.    In violating the ECPA, Defendants' conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiff, and a recklessly negligent or callous indifference to Plaintiff's and Class Members' protected rights under both state and federal law.

545.    Meta and Google also aided and abetted the installation of Tracking Technologies for Perplexity.

546.    Worse, not only were Meta and Google aware that deploying such Tracking Technologies was illegal under California law, Meta and Google also knew at the time they assisted Perplexity with  deployed these technologies that deploying these Technologies on

Perplexity's website would result in vast quantities' of users' data being shared with Google and Meta because that is what those technologies are specifically designed to do.

547. Indeed, Meta and Google not only intentionally harmed Plaintiff and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Defendants knew they had a duty to safeguard and keep confidential Plaintiff's and Class Members' data under CDAFA and other applicable laws;

b. Defendants knew that Plaintiff and Class Members reasonably expected their communications would remain private;

c. Defendants knew that Plaintiff's and Class Members' communications involved private and sensitive matters concerning Plaintiff's and Class Members' personal lives;

d. Meta and Google were aware that Perplexity had never disclosed to its users that their Conversational Dialogues were being shared with Meta and Google for advertising and marketing purposes;

e. Defendants knew they were prohibited by law from intercepting and disclosing Plaintiff's and Class Members' communications;

f. Defendants nonetheless knowingly and deliberately intercepted and disclosed to Third Party advertisers Plaintiff's and Class Members' personal information without Plaintiff's or Class Members' consent, in a knowing violation of multiple state and federal laws.

g. Defendants also intentionally concealed from the public the fact that, every time users interacted with the AI Machine that complete transcripts of their Conversational Dialogues were shared with Google and Meta for marketing purposes; and

h.    Defendants carried out their unlawful conduct with the wrongful and evil motive to appropriate Plaintiff's and Class Members' personal information at Plaintiff's and Class Members' expense and for their own financial gain.

548.    While not an element of Plaintiff's and Class Members' wiretap claim, based on the facts specifically identified the above paragraph, as well as the factual allegations contained elsewhere in this Complaint, a jury could reasonably conclude that Meta and Google intentionally and purposefully set out to violate the law when they decided to deploy surreptitious tracking technologies on Perplexity's AI Machine.

549.    The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

550.    Plaintiff, individually and on behalf of the Class Members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs

**COUNT VIII—VIOLATION OF THE COMPREHENSIVE
COMPUTER DATA ACCESS AND FRAUD ACT
("CDAFA") CAL. PENAL CODE § 502
Against Meta and Google
(On behalf of Plaintiff, the Class, and the Subclass)**

551.    Plaintiff re-alleges and incorporates all preceding paragraphs.

552.    Plaintiff brings this claim on behalf of himself and all members of the Class and the Subclass.

553.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502 ("CDAFA") to "expand the degree of protection . . . from tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of

the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." CAL. PENAL CODE § 502(a).

554.    Plaintiff's and the Class Members' devices on which they accessed the hospital website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

555.    Defendants violated § 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiff's and Class Members' devices in order to wrongfully obtain and use their personal data, including their sensitive personal information, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

556.    Defendants violated CAL. PENAL CODE § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiff's and the Class Members' personally identifiable information, including their personal information.

557.    Defendants used Plaintiff's and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits.  Specifically, Defendants intentionally concealed from Plaintiff and Class Members that Defendants had secretly installed tracking pixels Perplexity's AI Machine that surreptitiously shared user data with them.  Had Plaintiff and Class Members been aware of this practice, they would not have used Perplexity's website, AI Machine, and Mobile Application.

558.    The computers and mobile devices that Plaintiff and Class Members used when accessing Perplexity's AI Machine all have and operate "computer services" within the meaning of CDAFA. Defendants violated §§ 502(c)(3) and (7) of CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with their wrongful collection of such data.

559.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a

computer, computer system, or computer network without the intent or permission of the owner of the information." Defendants violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via the Meta Pixel and the Google Tracking Technologies embedded into AI Machine which intercepted Plaintiff's and the Class Members' private and sensitive information.

560.    Defendants' breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Perplexity took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit; and

(c)    The harm being suffered by Plaintiff and Class Members is ongoing because—as of the time of the filing of this complaint—Perplexity continues to permit the deployment of the Meta Pixel on its AI Machine.

561.    Plaintiff Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

562.    Plaintiff and the Class Members seek compensatory damages in accordance with CAL. PENAL CODE § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief.

563.    Plaintiff and Class Members are entitled to punitive or exemplary damages pursuant to CAL. PENAL CODE § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in CAL. CIVIL CODE § 3294.

564.    Plaintiff and the Class Members are also entitled to recover their reasonable attorney's fees under § 502(e)(2).

**COUNT IX—VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 635**
**Against Meta and Google**
**(On Behalf of Plaintiff, the Class, and the Subclass)**

565.    Plaintiff re-alleges and incorporates all preceding paragraphs.

566.    Plaintiff brings this claim on behalf of himself and all members of the Class and the Subclass.

567.    California Penal Code § 635 provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500)….

568.    At all relevant times, by implementing Meta's wiretaps, Meta intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping upon the communication of another.

569.    The Meta Pixel is a "device" that is "primarily or exclusively designed" for eavesdropping.  That is, the Meta Pixel is designed to gather information about what URLs users visit and what they search for.  The Meta Pixel is invisible to Perplexity's users and is specifically designed to transmit internet users' communications in real time directly to Meta.

570.    At all relevant times, by implementing Google's wiretaps, Google intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished a wiretap device that is primarily or exclusively designed or intended for eavesdropping upon the communication of another.

571.    Google Analytics is a "device" that is "primarily or exclusively designed" for eavesdropping.  That is, Google Analytics is designed to gather information about what URLs

users visit and what they search for.  Like the Meta Pixel, Google Analytics is invisible to Perplexity's users and is designed to transmit users' electronic communications in real time to Google.

572.    Plaintiff and Class Members did not consent to any of Meta's or Google's actions in deploying the wiretaps on Perplexity's website, AI Machine, and Mobile Application.

573.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by the violations of Cal. Penal Code § 635 and seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT X—VIOLATION OF THE FEDERAL WIRETAP ACT, 18 U.S.C. § 2512**
**Against Meta and Google**
**(On Behalf of Plaintiff and the Nationwide Class)**

574.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

575.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Meta and Google.

576.    18 U.S.C. § 2512, in pertinent part, holds "any person" liable who manufactures, assembles, or sells "any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce. 18 U.S.C. § 2512(1)(b).

577.    The Meta Pixel at issue here is an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5), and is primarily useful for the purpose of the surreptitious interception of electronic communications.

578.    Meta manufactured, marketed, and sold its technology with knowledge that it would primarily be used to illegally intercept electronic communications.  Meta played an active role in the interception, disclosure, and exploitation of Perplexity's users' communications.  Meta

not only manufactured, marketed, and distributed the intercepting Meta Pixel technology, but Meta also (1) provided guidance to Perplexity on how to configure and deploy the Meta Pixel, (2) hosted the intercepted communications that Meta received on Meta servers in California, (3) provided aggregated data summaries of the intercepted communications to Perplexity via online business accounts and dashboards that Meta made available to Perplexity, and (4) worked with Perplexity to exploit the intercepted communications for marketing and advertising purposes. Meta then further participated in interception and disclosure of Perplexity's users' communications by further sharing the intercepted communications with data brokers and other advertisers. Because Meta played an active role in both (1) hosting and operating the Meta Pixel and (2) receiving and using the data that it collected, Meta falls squarely within the ambit of 18 U.S.C. § 2512.

579.    Meta's conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520.

580.    Similarly, Google Analytics is also an "electronic, mechanical, or other device" as defined by 18 U.S.C. § 2510(5), and is primarily useful for the purpose of the surreptitious interception of electronic communications.

581.    Google manufactured, marketed, and sold its technology with knowledge that it would primarily be used to illegally intercept electronic communications. Google played an active role in the interception, disclosure, and exploitation of Perplexity's users' communications. Google not only manufactured, marketed, and distributed the intercepting technology, but Google received the intercepted communications in California, hosted the intercepted communications on its servers, and provided aggregated data reports summarizing the intercepted communications back to Perplexity so that Google and Perplexity could jointly exploit the intercepted communications for marketing and advertising purposes.

582.    Google then further actively participated in the interception and disclosure of Perplexity's users' communications by further sharing those communications with data brokers

and advertisers for commercial advantage.  Because Google played an active role in both (1) hosting and operating Google Analytics, Google DoubleClick, and Google Ads and (2) receiving and using the data it collected, Google falls squarely within the ambit of 18 U.S.C. § 2512.

583.    Google's conduct violated 18 U.S.C. § 2512 and therefore gives rise to a claim under 18 U.S.C. § 2520.

584.    Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members are entitled to the greater of actual damages or statutory damages or not less than $100 a day for each day of violation or $10,000, whichever is greater, against both Meta and Google.

**COUNT XI—VIOLATION OF THE CALIFORNIA INVASION
OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 630
ET SEQ.
Against Meta and Google
(On Behalf of Plaintiff, the Class, and the Subclass)**

585.    Plaintiff re-alleges and incorporates all preceding paragraphs.

586.    Plaintiff brings this claim on behalf of himself and all members of the Class and Subclass.

587.    The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

588.    To establish liability under section 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following things:

(6) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone

wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system";

(7) "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable";

(8) "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is … being sent from, or received at any place within this state;"

(9) "who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or"

(10)    "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section…."

589.    CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

590.    The Meta Pixel, Google DoubleClick, Google Ads, Google Analytics and Google Firebase Code, Conversions API, and related backend and frontend software code that Perplexity deployed on its website, AI Machine, and Mobile Application are "machine[s], instrument[s], contrivance[s], or … other manner[s]" that Perplexity used to engage in the prohibited conduct at issue in this case.

591.    All alleged communications between Plaintiff, Class Members, and Perplexity qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive

communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

592.    By contemporaneously intercepting, accessing, and reading Plaintiff's and Class Members' Conversational Dialogues communicated to Perplexity's AI Machine via surreptitious Tracking Technologies such as the Meta Pixel and Google Analytics, without consent and authorization of all parties, Meta and Google eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of sections 631(a) and 632 of the CIPA.

593.    Meta and Google, after intercepting users' Conversational Dialogues, have exploited users' personal information for their own purposes, including (1) selling targeted advertising; (2) building sophisticated user profiles; (3) sharing the communications with data brokers; and (4) using the Conversational Dialogues for research and product development, including training their internal AI systems.

594.    Meta and Google also aided Perplexity in similarly intercepting, disclosing, and exploiting the intercepted communications for Perplexity's benefit, including trading its users' personal information for access to marketing and analytics tools provided by Meta and Google.

595.    For example, Meta supplied Perplexity with the Meta Pixel software code that it used to deploy the Meta Pixel on its website and AI Machine.  Meta also provided Perplexity with specific instructions regarding how to configure the Meta Pixel to share data about users' interactions with Perplexity's AI Machine with Meta.  Meta also aided Perplexity in intercepting, disclosing, and using its customers' Conversational Dialogues by providing online dashboards by which Perplexity could access data about the intercepted communications in real-time and use that data to target users with advertisements and enhance its own products and services in reliance upon the analytics data that Meta provided about the intercepted communications.

596.    Similarly, Google also supplied Perplexity with the software code for multiple Tracking Technologies, including Google Ads, Google DoubleClick, Google Analytics, and

Google Firebase code, along with specific instructions for how Perplexity could configure these Tracking Technologies to share its customers' data with Google for marketing and analytics purposes. Google also aided Perplexity in intercepting, disclosing, and using its customers' Conversational Dialogues by providing online dashboards by which Perplexity could access data about the intercepted communications in real-time and use that data to target users with advertisements and enhance its own products and services in reliance upon the analytics data that Google provided about the intercepted communications.

597. At all relevant times, Meta and Google's aiding of Perplexity's interception and disclosure of its users' communications for the purpose of commercially exploiting them was without authorization and consent.

598. The Conversational Dialogues and other personal information collected by Meta and Google constitutes "confidential communications," as that term is used in section 632 because Plaintiff and Class Members had reasonable expectations of privacy with respect to their Conversational Dialogues with Perplexity's AI Machine. Plaintiff and Class Members had an objectively reasonable expectation of privacy because such information is protected against unauthorized disclosure by state and federal law.

599. At all relevant times, Perplexity used the intercepted communications that had been shared with Meta and Google by exploiting the analytics data that Meta and Google made available to Perplexity after Meta and Google analyzed and reviewed the intercepted communications. This included using the analytics data that Meta and Google sent back to Perplexity to enhance Perplexity's marketing schemes, to improve the operation of its website, and to train its AI technologies.

600. The Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Perplexity. Perplexity never informed its users that its "Incognito" mode was a sham or that interacting with Perplexity's AI Machine in Incognito mode would not protect users from having the contents of their communications shared

with Meta and Google. Perplexity never received express consent from its users to share their Conversational Dialogues with Meta and Google. Nor could Perplexity have received consent from Plaintiff and Class Members because Perplexity never sought to, or did, obtain Plaintiff's and Class Members' consent to transmit their Conversational Dialogues to Meta and Google.

601.    Meta and Google engaged in and continues to engage in prohibited conduct by aiding Perplexity to secretly intercept, read, learn, and use the contents of Plaintiff's communications.

602.    The intercepting devices used in this case include, but are not limited to:

(d)    Plaintiff's and Class Members' personal computing devices;

(e)    Plaintiff's and Class Members' web browsers;

(f)    Plaintiff's and Class Members' mobile devices;

(g)    Plaintiff's and Class Members' browser-managed files;

(h)    The Meta Pixel;

(i)    Google DoubleClick, Google Ads, Google Firebase code, and Google Analytics;

(j)    Internet cookies;

(k)    Defendants' computer servers;

(l)    Third-party source code utilized by Defendants; and

(m)    Computer servers of third parties (including Meta and Google) to which Plaintiff's Class Members' communications were disclosed.

603.    Meta and Google aided in the interception of "contents" in at least the following forms:

(n)    The parties to the communications;

(o)    The precise text of users' Conversational Dialogues;

(p)    Personally identifying information such as users' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

CASE NO. _____3:26-cv-02803    − 131 −

(q)     The precise text of specific buttons on Perplexity's website(s) that users click to exchange communications, including Log-Ins, Registrations, Search, and other buttons;

(r)     The precise dates and times when users' accessed Perplexity's AI Machine;

(s)     Information that is a general summary or informs third parties of the general subject of communications that Perplexity sent back to users in response to search queries and requests for information;

(t)      Any other content that Perplexity has aided third parties in scraping from webpages or communications with its AI Machine and Mobile Application.

604.    Plaintiff Class Members reasonably expected that their personal information and the contents of their Conversational Dialogues were not being intercepted, recorded, and disclosed to Meta, Google, and other third parties.

605.    The tracking pixels that Meta and Google designed are configured such that they transmitted each of a website user's actions to Meta and Google alongside and contemporaneously with the user initiating the communication.  Thus, Plaintiff and Class Members' communications were intercepted in transit to the intended recipient (Perplexity) before they reached Perplexity's servers in California.

606.    Meta and Google gave Perplexity substantial assistance in violating the privacy rights of Perplexity's users, despite the fact Perplexity's conduct constituted a breach of the duties of confidentiality that it owed users.

607.    Meta and Google knew that the installation of the Meta Pixel and the Google Tracking Technologies on Perplexity's website, AI Machine, and Mobile Application would result in the unauthorized disclosure of its users' communications to Meta and Google, yet nevertheless encouraged Perplexity to deploy these technologies anyway.  Indeed, the only

purpose of Tracking Technologies like the Meta Pixel and Google Analytics is to share information with third parties.

608.    Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Conversational Dialogues and associated personal information, including using their personal information to develop marketing and advertising strategies. The private information that Perplexity assisted Meta, Google, and other third parties with reading, learning, and exploiting included Plaintiff's and Class Members' medical conditions, their political views, their sexual preferences, their financial prospects, and their mental health concerns.

609.    Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

610.    In addition to statutory damages, Defendants' breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Meta and Google took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value; and

(c)    Meta and Google's subsequent unauthorized disclosures have resulted in multiple third-party data brokers obtaining Plaintiff and Class Members' personal information, which can only be remediated by the purchase of expensive data privacy products such as DeleteMe and CyEx Privacy Shield, costing hundreds of dollars a year.

611.    Plaintiff and Class Members have also suffered irreparable injury from Defendants' unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendants without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.  Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

612.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XII—INVASION OF PRIVACY AND VIOLATION OF
THE CALIFORNIA CONSTITUTION, ART. 1, § 1
Against Meta and Google
(On Behalf of Plaintiff, the Class, and the Subclass)**

613.    Plaintiff re-alleges and incorporates all preceding paragraphs.

614.    Plaintiff brings this claim on behalf of himself and all members of the Class, and the Subclass.

615.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

616.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

617.    The right to privacy in California's constitution creates a right of action against private and government entities.

618.    Plaintiff and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

619.    Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Defendants included personal, sensitive information; and (ii) Plaintiff and Class Members did not consent or otherwise authorize Perplexity to disclose this information, including complete transcripts of their Conversational Dialogues, to others for their own monetary gain.

620.    Plaintiff and Class Members had a reasonable expectation of privacy that their communications, identity, and sensitive information would remain confidential and that Meta and Google would not employ surreptitious wiretapping technology on Perplexity's website, AI Machine, and Mobile Application to secretly intercept, read, and exploit their communications.

621.    Given the nature of the information that Perplexity disclosed to Meta, Google, and other third parties, such as users' email addresses, names, search terms, and the entire transcripts of their Conversational Dialogues—information that was shared even when users held conversations with the AI Machine in Incognito mode—this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

622.    The disclosure of users' Conversational Dialogues and their personally identifiable information constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Class Members' rights to privacy.

623.    Plaintiff and Class Members did not consent to, authorize, or know about Perplexity's disclosure of their communications to Meta, Google, and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their Conversational Dialogues with Perplexity's AI Machine information could be collected, used, and monetized by Meta and Google.

CASE NO. ——————————3:26-cv-02803    − 135 −

624.    Plaintiff and Class Members have been damaged as a direct and proximate result of Meta and Google's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

625.    Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Meta and Google as a result of its intrusions on Plaintiff's and Class Members' privacy.

626.    Meta and Google's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Plaintiff and Class Members cannot remediate the privacy harms they have suffered without expending many hours and spending hundreds of dollars a year to pay for third-party services to scrub their information from data broker rolls;

(c)    Meta and Google took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value; and

(d)    Perplexity's actions diminished the value of Plaintiff's and Class Members' personal information.

627.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Meta and Google's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

628.    Plaintiff and Class Members seek attorney's fees in accordance with CAL. CIV. PROC. CODE § 1021.5 (West).

629.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIII—VIOLATION OF CALIFORNIA'S UNFAIR
COMPETITION LAW
(Cal. Bus. & Prof. Code §§ 17200, et seq.)
Against Meta and Google
(On Behalf of Plaintiff, the Class, and the Subclass)**

630.    Plaintiff incorporates all other paragraphs as if fully stated herein.

631.    Plaintiff brings this claim on behalf of himself, the Class, and the Subclass.

632.    California Business and Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

633.    Google and Meta have engaged in unlawful and unfair business practices.

634.    Plaintiff, Class Members, and Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

635.    California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.

636.    Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. Seq.* (the "UCL") because, as alleged above, Defendants violated California common law, the California Constitution, and other statutes and causes of action alleged herein, including violations of sections 631, 632, and 635 of the California Penal Code, violations of sections 2510 and 2512 of the Federal Wiretap Act, and violations of CDAFA.

637.    Defendants engaged in unlawful acts and practices by employing surreptitious Tracking Technologies to intercept, record, read, and exploit users' Conversational Dialogues.

638.     Meta and Google's actions offend public policy.

639.    Had Plaintiff and Class Members known that Defendants would intercept, collect, and transmit their Conversational Dialogues, Plaintiff and Class Members would not have interacted with Perplexity's AI Machine.

640.    Plaintiff and Class Members have a property interest in their Conversational Dialogues.  Personal Health Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' personal information, Defendants have taken property from Plaintiff and Class Members  without providing just (or indeed *any*) compensation.

641.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' data brokers and other third parties, Defendants have taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class Members.

642.    Defendants' business acts and practices also meet the unfairness prong of California's Unfair Competition Law ("UCL") according to all three theories of unfairness.

643.    First, Defendants' business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* (2006) 142 Cal. App. 4th 1394, 1403: (a) Plaintiff and Class Members suffered substantial injury due to Defendants' disclosure of their personal information; (b) Defendants' disclosure of Plaintiff's and Class Members personal information provides no benefit to consumers, let alone any countervailing benefit that could justify Defendants' disclosure of users' Conversational Dialogues without consent for marketing purposes or other pecuniary gain; and (c) Plaintiff and Class Members could not have readily avoided this injury because they had no way of knowing that Defendants were implementing the Tracking Technologies inside Perplexity's AI Machine. Thus, Plaintiff and Class Members did not know to ask Defendants to stop the practice of disclosing their personal information.

644.    Second, Defendants' business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiff and Class Members, and "the utility of [Defendants'] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiff and Class Members. *Drum v. San Fernando Valley Bar Ass'n*, (2010) 182 Cal. App. 4th 247, 257. Defendants secretly collected, disclosed, and otherwise misused Plaintiff's and Class Members as part of a scheme whereby Perplexity traded

its users' confidential information to Meta and Google in return for marketing and analytics benefits.  This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

645. Third, Defendants' business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data. This public policy is codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*.; and the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, among other statutes. Defendants violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff's and Class Members' personal information by sharing that information with data brokers and other third parties via the Tracking Technologies without Plaintiff's and/or Class Members' consent.

646. Defendants' business acts and practices are also "unfair" under the UCL because they violate multiple federal laws, including the Federal Wiretap Act.

647. Plaintiff and Class Members have a property interest in their Conversational Dialogues. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' Conversational Dialogues, Defendants have taken property from Plaintiff and Class Members without providing just (or indeed *any*) compensation.

648. Plaintiff and Class Members have lost money and property due to Defendants' conduct in violation of the UCL. Personal information like that Defendants collected and exploited has objective monetary value. Companies are willing to pay for such personal information as shown by Meta and Google's business practices.

649.    Consumers also value their personal data.  For example, according to the annual Financial Trust Index Survey conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent of survey participants would not share their health data with a digital platform for free. Half of the survey participants would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[93]

650.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' personal information, Defendants have taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class Members.

651.    Plaintiff and the Class Members also face a real and immediate threat of future injury to the confidentiality of their personal information both because such information remains within Defendants' control and because anytime that Plaintiff and Class Members use Perplexity's AI Machine, Plaintiff and Class Members risk further disclosure of their Conversational Dialogues.

652.    As a direct and proximate result of Defendants' unfair and unlawful methods and practices of competition, Plaintiff and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Conversational Dialogues.

653.    As a direct and proximate result of their unfair and unlawful business practices, Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

[93]    https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html

**COUNT XIV—UNJUST ENRICHMENT**
**Against Meta and Google**
**(On Behalf of Plaintiff, the Class, and the Subclass)**

654.    Plaintiff re-alleges and incorporates all preceding paragraphs.

655.    Plaintiff brings this claim on behalf of himself, the Class, and the Subclass

656.    To the extent required by law, this count is alleged in the alternative to Plaintiff's legal claims pursuant to F.R.C.P. 8.

657.    Meta and Google wrongfully and unlawfully received, used, and/or sold Plaintiff's and Class Members' Conversational Dialogues and sensitive, personal information without their consent.  Meta and Google benefitted financially from doing so.

658.    Meta and Google have been unjustly enriched at the expense of Plaintiff and Class Members.

659.    Meta and Google have unjustly retained the benefits of their unlawful and wrongful conduct.

660.    It would be inequitable and unjust for Meta and Google to retain any of the unlawful proceeds resulting from their unlawful and wrongful conduct.

661.    Plaintiff and Class Members have suffered an injury in fact and have lost money as a result of Meta and Google's unjust conduct.  Plaintiff and Class Members lack an adequate remedy at law with respect to this claim and are entitled to disgorgement of the financial profits that Meta and Google obtained as a result of their unjust conduct.

**VI. DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

**VII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectively requests relief against Defendants as set forth below:

a.    Certifying the Class and appointing Plaintiff as the Classes' representative;

b.    Finding that Defendants' conduct as alleged herein was unlawful;

c.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Defendants from making any further disclosure of Plaintiff and Class Members' communications to Third Parties without the Plaintiff and Class Members' express, informed, and written consent; requiring Defendants to implement adequate procedures for ensuring the confidentiality of users' communications; mandating that Defendants hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Defendants provide written verifications on a quarterly basis to the court and counsel for Plaintiff and Class Members in the form of a declaration under oath that the above steps;

d.    Awarding statutory damages of $5,000 per violation for Defendants' violation of the Electronic Communications Privacy Act;

e.    Imposing a constructive trust against Defendants through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendants;

f.    Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g.    Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

h.    Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

i.    Awarding costs of suit; and

j.    Such other and further relief to which Plaintiff and Class Members may be entitled.

CASE NO. _____3:26-cv-02803   − 142 −

Dated: ~~March 31~~April 10, 2026                    Respectfully submitted,

/s/  Foster C. Johnson
Foster C. Johnson (SBN 289055)
Joeseph Ahmad*
~~Mark Holden*~~
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney Street, Suite 2500
Houston TX 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
fjohnson@azalaw.com
joeahmad@azalaw.com
~~mholden@azalaw.com~~


**COUNSEL FOR PLAINTIFF,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARY SITUATED**


*\* Pro Hac Vice Pending*